Jerry J. QUICK, Kaira G. Quick, John M. Bryant, Ruth E. Bryant, Joe Cox, Dolores Cox, Florence Turck and Circle C Land Corp., Petitioners,

v.

CITY OF AUSTIN, Save Our Springs Legal Defense Fund, Inc. and Al St. Louis, Respondents.

No. 96–1154.

Supreme Court of Texas.

Argued Nov. 3, 1997.

Decided May 8, 1998.

Opinion Granting Rehearing Sept. 30, 1999.

Roy Q. Minton, John L. Foster, Bob E. Shannon, Joseph R. Knight, Robert I. Howell, Scott K. Field, Joe R. Greenhill, Austin, for Petitioners.

William G. Bunch, Thomas H. Watkins, Andrew F. Martin, Elizabeth G. Bloch, James K. McClendon, Frank C. Cooksey, Pamela Stanton Baron, Austin, Michael A. Hatchell, Tyler, Dick DeGuerin, Houston, Teresa L. Todd, Marfa, for Respondents.

Justice ABBOTT delivered the opinion of the Court.

We are confronted with a challenge to the City of Austin's Save Our Springs Or-dinance, a water pollution control measure enacted in 1992. Petitioners, who own land within the City of Austin's extraterritorial jurisdiction, brought this action contesting the Ordinance. Petitioners claim that the Ordinance is arbitrary, unreasonable, and inefficient. Petitioners also assert that the Ordinance is void because it was enacted without a public hearing, it impermissibly regulates the number, use, and size of buildings in the City's extraterritorial jurisdiction, and it has not been approved by the Texas Natural Resource Conservation Commission. The trial court rendered judgment in favor of Petitioners, holding that the Ordinance was null and void. The court of appeals reversed in part and modified in part, rendering judgment that the Ordinance was valid. 930 S.W.2d 678. Although we do not agree with all of the court of appeals' analysis, we affirm its judgment upholding the Ordinance's validity.

## I

Frustrated by their perception that the Austin City Council was failing to safeguard Barton Springs adequately, a group of Austin citizens interested in protecting the environment initiated the Save Our Springs Ordinance and placed it on the Austin municipal ballot for a local referendum election. In August 1992, the Austin citizens participating in the referendum election overwhelmingly approved the Ordinance. Two days after the voters approved the Ordinance, the Austin City Council enacted the Ordinance and incorporated it into the City Code.

The purpose of the Ordinance, according to its Declaration of Intent, is to insure water quality control in Barton Creek, Barton Springs, and the Barton Springs Edwards Aquifer.[1] The provisions of the

---

1. The Barton Springs Edwards Aquifer is that portion of an underground system of water-bearing formations in Central Texas that recharges Barton Springs. Barton Springs is a spring surfacing in Austin that is fed by and feeds Barton Creek. Barton Springs and Barton Creek provide a significant source of Austin's water supply. Barton Springs also

Ordinance apply to those areas within Austin and Austin's extraterritorial jurisdiction that contain watersheds contributing to Barton Springs. The Ordinance limits impervious or non-porous cover on land in the regulated areas to between 15% and 25% of the net site area. The Ordinance also requires that new developments be set back from streams and not contribute to an increase in the amount of pollution constituents commonly found in urban rainfall runoff water. Construction in the "critical water quality zone" of the Barton Creek watershed is prohibited by the Ordinance. The Ordinance provides for no waivers or exceptions unless necessary to avoid conflict with state and federal laws.

Petitioners Jerry J. Quick, Kaira G. Quick, John M. Bryant, Ruth E. Bryant, Joe Cox, Dolores Cox, Florence Turck, and Circle C Land Corporation all own land outside the city limits of Austin but within its extraterritorial jurisdiction. Because their land is within Austin's extraterritorial jurisdiction, any development of their property must comply with the Ordinance. The Petitioners sued the City in Hays County, seeking a declaratory judgment that the Ordinance was void because it was illegally enacted. Additionally, Petitioners challenged the Ordinance under section 26.177(d) of the Texas Water Code, which authorizes a party aggrieved by a water pollution control ordinance to appeal to district court to review whether the ordinance is invalid, arbitrary, unreasonable, inefficient, or ineffective.

Save Our Springs Alliance, Inc., an incorporated association of individuals led by the citizen initiators of the Ordinance, moved to intervene in the suit. The Alliance urged that the City was incapable of adequately advocating the Alliance's interest due to previous hostilities over the Ordinance. *See, e.g., City Council of Austin v. Save Our Springs Coalition,* 828 S.W.2d 340 (Tex.App.—Austin 1992, no writ)(citizens sued City to force election on

the Ordinance). The trial court, however, struck the plea in intervention, leaving the City to defend the Ordinance.

The Petitioners and the City proceeded to try the case to a jury. The jury answered "yes" to all the questions in the charge inquiring whether the Ordinance and its impervious cover limitations, its prohibition against increases in pollution constituents, and its failure to contain variances were an unreasonable, arbitrary, and inefficient attempt to control water quality. The jury also found that the Ordinance was not a proper subject for the initiative and referendum process and that the Ordinance regulated the number, use, and size of buildings in the City's extraterritorial jurisdiction (a violation of section 212.003 of the Texas Local Government Code).

Based on the jury's answers, the trial court rendered judgment for the Petitioners declaring the Ordinance null and void. The trial court's final judgment also contained conclusions of law, including that the Ordinance was ineffective because the Texas Natural Resource Conservation Commission had not approved it and that the Ordinance was void because it was enacted without a public hearing in violation of section 212.002 of the Local Government Code. The trial court further decreed that any permit required by Petitioner Circle C Land Corporation to develop its property would be subject only to the law in effect when the original application for preliminary subdivision approval was filed, which, in some cases, pre-dated the enactment of the Ordinance.

The court of appeals reversed and rendered in part and modified in part the trial court's judgment. 930 S.W.2d 678. The appellate court first determined that the trial court did not abuse its discretion in striking the Alliance's plea in intervention. 930 S.W.2d at 683. The court of appeals then concluded that the trial court erred in rendering judgment that the Ordinance

contributes to a unique recreational attraction in Austin, Barton Springs Pool, a spring-fed

outdoor swimming pool open throughout the year.

was unreasonable, arbitrary, and inefficient pursuant to section 26.177(d) of the Texas Water Code because section 26.177(d) was unconstitutional under article II, section 1 of the Texas Constitution, the separation of powers provision. *Id.* at 685. The court of appeals further held that the Ordinance was not illegally enacted because (1) it did not require approval by the Texas Natural Resource Conservation Commission before it could become effective, (2) it was not subject to sections 212.002 and 212.003 of the Local Government Code, and (3) it was a proper subject of the initiative and referendum process. *Id.* at 686–91. The appellate court accordingly reversed the trial court's judgment in part and rendered judgment that the Ordinance was a valid legislative act. The court of appeals also modified the trial court's judgment in part, holding that any permit required by Circle C would be considered only under the regulations and ordinances in effect when the original application for preliminary subdivision approval was filed, *as long as the permit application was filed after September 1, 1987. Id.* at 693–94.

Petitioners challenged the court of appeals' judgment by filing an application for writ of error with this Court. Petitioners allege that the court of appeals erred by holding (1) that section 26.177(d) of the Water Code is unconstitutional as a violation of separation of powers, (2) that the Ordinance is not subject to sections 212.002 and 212.003 of the Local Government Code, (3) that the Ordinance is effective without the City first obtaining the Texas Natural Resource Conservation Commission's approval, (4) that the Ordinance was a proper subject of the initiative and referendum process, and (5) that only Circle C's permit applications filed after September 1, 1987 would be considered on the basis of the regulations and ordinances in effect at that time. The Alliance also filed its own application for writ of error, contending that the court of appeals erred in upholding the trial court's striking of its plea in intervention.

## II

We first consider the constitutionality of section 26.177(d) of the Texas Water Code. Section 26.177(d) provides in pertinent part:

> Any person affected by any ... ordinance ... relating to water pollution control and abatement outside the corporate limits of such city adopted pursuant to this section or any other statutory authorization may appeal such action to the [Texas Natural Resource Conservation Commission] or district court.... The issue on appeal is whether the action or program is invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality. The commission or district court may overturn or modify the action of the city.

TEX. WATER CODE § 26.177(d).

The trial court submitted several questions to the jury inquiring whether various provisions of the Ordinance were "unreasonable," "arbitrary," or "inefficient." Based on the jury's affirmative answers to these questions, the court then rendered judgment that the Ordinance was invalid under section 26.177(d).

The court of appeals, however, concluded that section 26.177(d) violates the separation of powers doctrine of the Texas Constitution because it requires a de novo review of a legislative act. The court of appeals reasoned that the trial court conducted a de novo review of the statute as evidenced by the court's charge asking the jury to determine, by a preponderance of the evidence, whether the jury thought the Ordinance was unreasonable, arbitrary, or inefficient. The court of appeals further ruled that section 26.177(d) authorized such an unconstitutional de novo review by permitting the reviewing court to "modify" a legislative act and to determine whether a legislative act was "inefficient" or "ineffective."

### A

A legislative function cannot, under the separation of powers doctrine, be re-

viewed de novo [2] by any other branch of government. Article II, section 1 of the Texas Constitution divides the functions of government as follows:

[T]hree distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others.

TEX. CONST. art. II, § 1. Consistent with this division of power, we have recognized that, when the Legislature delegates a legislative function to a municipality or an administrative agency, a de novo review by the judiciary of the delegated function violates the Constitution. *Chemical Bank & Trust Co. v. Falkner,* 369 S.W.2d 427, 432–33 (Tex.1963); *Davis v. City of Lubbock,* 160 Tex. 38, 326 S.W.2d 699, 712–14 (1959); *Southern Canal Co. v. State Bd. of Water Eng'rs,* 159 Tex. 227, 318 S.W.2d 619, 621–22 (1958).

■ The Petitioners concede that, if section 26.177(d) in fact confers the power on the courts to review a legislative function de novo, the statute is unconstitutional as a violation of the separation of powers provision of our state constitution. Petitioners also concede that the Ordinance represents the exercise of a legislative function the Legislature has delegated to the City. Accordingly, the only issue we must determine is whether section 26.177(d) necessitates a de novo review by the judiciary. If it does, it is unconstitutional; if it does not, it is constitutional.

■ In analyzing the constitutionality of a statute, we should, if possible, interpret the statute in a manner that avoids constitutional infirmity. *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 629 (Tex.1996).

Moreover, if any provision of the statute is held to be invalid, the invalidity does not affect other provisions that can properly be given effect in the absence of the invalid provisions. *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 844 (Tex.1990); *see also* TEX. GOV'T CODE § 311.032(c).

The Petitioners argue that, under these standards, section 26.177(d) does not unconstitutionally authorize de novo review of a legislative act. The Petitioners maintain that the Legislature did not expressly mandate de novo review, but rather used neutral terms consistent with the constitutionally appropriate standard for judicial review of legislative acts. Petitioners observe that section 26.177(d) employs terms such as "unreasonable" and "arbitrary," which are consistent with the standard of review traditionally employed in reviewing city ordinances. *See City of Brookside Village v. Comeau,* 633 S.W.2d 790, 792 (Tex.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982)(city ordinance is presumed valid unless the ordinance is unreasonable and arbitrary); *Hunt v. City of San Antonio,* 462 S.W.2d 536, 539 (Tex.1971)(same). Petitioners also rely on this Court's holding in *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 394 (Tex.1989), that legislative acts can be reviewed for "efficiency." Petitioners alternatively urge that, even assuming that certain words in the statute impermissibly connote a de novo review, this Court should excise those words and uphold the remaining portions of the statute.

The City responds that section 26.177(d)'s effect is to require a court to reweigh the City's legislative decisions regarding the reasonableness, effectiveness, and efficiency of the Ordinance, which is an unconstitutional judicial review of public policy determinations. The intrusiveness of section 26.177(d) is demonstrated, according to the City, by the fact that the jury was asked to decide in this case, by a

---

**2.** In a de novo review, the reviewing tribunal determines each issue of fact and law without according deference to the original tribunal's decision. *See Post* at 116.

preponderance of the evidence, whether the Ordinance was "inefficient," "unreasonable," or "arbitrary." Section 26.177(d) is not, the City continues, similar to a permitted review of whether a legislative act is unreasonable or arbitrary. Moreover, the City argues that *Edgewood*, 777 S.W.2d at 394, does not apply because our decision in that case was premised on a unique state constitutional provision, article VII, section 1, which charged the Legislature with the duty to provide for "an efficient system of public free schools." Because there is no constitutional mandate that a water quality ordinance be "efficient," the City avers that *Edgewood* does not mean that courts may routinely review the efficiency of legislation. Finally, the City asserts that severing any offending terms in section 26.177(d) would contravene legislative intent and would render the statute devoid of meaning.

■ The City correctly argues that the trial court erred in submitting a question for the jury to determine, based on a preponderance of the evidence, whether the Ordinance was arbitrary, unreasonable, or inefficient. The judiciary has no power to allow a jury to redecide the policy behind legislative issues by a preponderance of the evidence. *See Southern Canal*, 318 S.W.2d at 623–24. Instead, in reviewing an ordinance, the court is to consider all the circumstances and determine as a matter of law whether the legislation is invalidated by a relevant statute or constitutional provision. *Cf. Comeau*, 633 S.W.2d at 793. Nevertheless, the fact that the trial court in this case impermissibly submitted these questions to the jury does not mandate that the *statute* is unconstitutional. The submitted jury questions, being questions of law, are immaterial and will not be considered. *Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 157 (Tex.1994)(court may disregard as immaterial a jury's finding on a question of law). We will instead rely on the provisions of the statute itself to determine its constitutionality.

■ The court of appeals focused on certain words in the statute, such as "inefficient," "ineffective," and "modify," as the basis for its conclusion that the statute unconstitutionally authorizes a de novo review for legislative acts. However, a standard of review is more than just words; rather, it embodies principles regarding the amount of deference a reviewing tribunal accords the original tribunal's decision. The key to determining whether section 26.177(d) authorizes a de novo review is therefore the amount of deference the statute requires the reviewing tribunal to give to the original tribunal's decision.

■ When conducting a de novo review, the reviewing tribunal exercises its own judgment and redetermines each issue of fact and law. *Key Western Life Ins. Co. v. State Bd. of Ins.*, 163 Tex. 11, 350 S.W.2d 839, 846 (1961); *Lone Star Gas Co. v. State*, 137 Tex. 279, 153 S.W.2d 681, 692 (1941); *Ysleta Ind. Sch. Dist. v. Meno*, 933 S.W.2d 748, 751 n. 5 (Tex.App.—Austin 1996, writ denied). In such a review, the reviewing tribunal accords the original tribunal's decision absolutely no deference. *See, e.g., State v. Heal*, 917 S.W.2d 6, 9 (Tex.1996); *Ysleta*, 933 S.W.2d at 751 n. 5. Accordingly, then, the controlling issue is whether section 26.177(d) requires that the Ordinance be given practically no deference by the reviewing court.

We hold that section 26.177(d) does not mandate such a result. In reaching this conclusion, we abide by the maxim that courts should, if possible, interpret statutes in a manner that avoids constitutional infirmities. *Barshop*, 925 S.W.2d at 629. We note that section 26.177(d) utilizes two words, "unreasonable" and "arbitrary," that this Court has repeatedly stated connote the proper deferential standard of reviewing a city ordinance. *Comeau*, 633 S.W.2d at 792 (city ordinance is presumed to be valid unless the ordinance is unreasonable and arbitrary); *Thompson v. City of Palestine*, 510 S.W.2d 579, 581–82 (Tex.1974)(describing extraordinary bur-

den on party attacking ordinance to show that reasonable minds could not differ on whether the ordinance has a substantial relationship to the general welfare and that the city acted arbitrarily); *Hunt*, 462 S.W.2d at 539 (city ordinance is presumed to be valid unless the ordinance is unreasonable and arbitrary).

In the context of the deferential standard predicated by the words "unreasonable" and "arbitrary," we cannot agree with the court of appeals that the inclusion of "inefficient" and "ineffective" somehow requires a transformation of the standard of review from the proper deferential standard to a standard in which the City's decision is afforded no deference. In fact, on prior occasions, albeit under different circumstances, this Court has interpreted the word "efficient" in a more deferential manner than would have been required under a de novo review. *See, e.g., Edgewood*, 777 S.W.2d at 398–99 (utilizing the term "efficient" in article VII, section 1 of the Texas Constitution to provide a standard to measure the constitutionality of the Texas system for financing public education in Texas, but recognizing that the Legislature, rather than the courts, had "the primary responsibility to decide how best to achieve an efficient system"); *Central Educ. Agency of State of Texas v. Upshur County Com'rs Court*, 731 S.W.2d 559, 561 (Tex.1987)(holding that Commissioner of Education's responsibility to "promote efficiency and improvement" did not mean that Commissioner could conduct a de novo review of county commissioners' detachment and annexation decisions). We accordingly perceive no constitutional impediment to judicial review of an ordinance to determine whether it is "inefficient" or "ineffective" under the appropriate deferential standard of review.

The principles that underlie this deferential standard of review for municipal legislation are summarized in our decision in *Comeau*, 633 S.W.2d at 792–93. The party attacking the ordinance bears the "extraordinary burden" to establish

" 'that no conclusive or even controversial or issuable fact or condition existed' " that would authorize the passage of the ordinance. *Id.* (quoting *Thompson*, 510 S.W.2d at 581). We consider all the circumstances and determine, as a substantive matter, if reasonable minds could differ as to whether the ordinance has a substantial relationship to the protection of the general health, safety, or welfare of the public. *Id.* at 793. If the evidence reveals a fact issue in this respect, the ordinance must be upheld. *Id.* Accordingly, we hold that, under this deferential standard of review, the Texas Constitution is not violated by the judiciary considering, according to the mandates of section 26.177(d) of the Water Code, whether a water control ordinance is invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality.

We further do not believe that the provision in section 26.177(d) allowing the reviewing court to "modify" the city's action connotes an impermissible de novo review. Courts ordinarily cannot strike down an entire ordinance as invalid based on the invalidity of only a part of the ordinance, unless all the provisions of the ordinance are so dependent or connected that it cannot be presumed that one provision would have been passed without the others. *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844 (Tex.1990). If a reviewing court were to determine that one portion of a water control ordinance was invalid, the court would therefore be required to "modify" the ordinance to delete the invalid portion if the remainder of the ordinance was complete in itself and capable of being executed in accordance with the apparent legislative intent. *See id.* The Legislature's use of the word "modify" thus does not render section 26.177(d) unconstitutional. We disagree with the court of appeals' holding that section 26.177(d) violates the separation of powers doctrine and is unconstitutional. Rather, we will interpret and apply section 26.177(d) consistent with the defer-

ential standard of review this Court articulated in *Comeau*.

## B

■ Petitioners urge that the Ordinance's invalidity under the *Comeau* standard is manifest. Petitioners rely upon evidence in the record that, before the passage of the Ordinance, the City already had the most stringent water quality standards in Texas. Moreover, a city engineer and the head of Austin's Environmental Services admitted during trial that no discernible trend of pollution existed in Barton Springs prior to the Ordinance's enactment. Accordingly, Petitioners maintain that the Ordinance was unnecessary and based on flawed data.

Petitioners also complain that it is impossible to comply with the Ordinance. The Ordinance requires that a development not increase annual pollution loadings of thirteen identified constituents. Petitioners contend that the rules implemented by the City of Austin to execute the Ordinance require runoff surface water from a development to have lower average concentrations of some of these constituents than was found in certain rain samples taken in Austin.[3] In fact, Petitioners point out that the Ordinance requires that runoff surface water have less average nitrogen than contained in some name-brand bottled drinking water.[4] Petitioners allege that the Ordinance's practical effect is therefore a preclusion of all development in the watershed areas.

Petitioners also attack the lack of variances in the Ordinance. For instance, even if a landowner could establish that no increase in pollution would result from constructing a greater percentage of impervious cover than allowed under the Ordinance, no variance is permitted.

Finally, Petitioners impugn the Ordinance's financial impact. The City's own expert economist concluded that the Ordinance would, over a fifteen-year period, decrease property values in the watershed areas in the range of $229 million to $379 million. The Petitioners introduced evidence at trial that some land lost ninety percent of its value because of the Ordinance.

The City presented evidence at trial that sharply contradicted the Petitioners' arguments. In response to the Petitioners' evidence regarding the effectiveness of the water control ordinances in place before the Save Our Springs Ordinance, the City provided testimony that the Ordinance was cheaper and easier to administer than earlier measures. Further, the evidence also established that eighty-six percent of all development applications received a variance under the water quality ordinance in effect immediately prior to the Save Our Springs Ordinance. This excessive grant of variances under the prior ordinance, according to the City, obviously undercut its effectiveness.

To rebut the Petitioners' claim that it is impossible to comply with the Ordinance because its rules require that runoff be purer than rain, the City elicited testimony from Stephen Stecher, the project director of the Barton Creek watershed study. He testified that soil and plants on the ground

---

3. As support for this contention, Petitioners rely on a water quality analysis of sixteen rainfall samples taken at three locations. The City, however, elicited testimony that the water quality analysis of the samples was unreliable because not enough rain was collected and several of the samples were contaminated.

4. Petitioners introduced into evidence a label from a bottle of Evian natural spring water showing a nitrate concentration exceeding the runoff requirements under the Ordinance's technical rules. Because the purpose of the Ordinance's rules is to ensure that no *increases* occur in the average annual loadings of constituents such as nitrogen, Petitioners' comparison to Evian merely establishes that natural runoff in the Barton Creek watershed has a lower concentration of nitrates than the spring waters producing Evian bottled water. Accordingly, this evidence is actually not probative of whether compliance with the technical requirements of the Ordinance is possible.

typically capture much of the nitrogen and some other constituents in urban rainfall before the constituents reach a creek or tributary. Accordingly, even assuming that the Petitioners' evidence regarding the rainfall samples was reliable, *see* ante at n. 3, the City contends that compliance with the technical rules is still possible because runoff is naturally less contaminated with certain pollutants than rainfall. In further support of its argument that it is not impossible to comply with the Ordinance, the City presented testimony from two developers that it is not only possible, but actually profitable to develop land in the watershed areas in compliance with the Ordinance. These developers both testified that they were anticipating sizable profits from their developments complying with the strictures of the Ordinance.

Finally, the City offered evidence that the impervious cover limitations in the Ordinance reduce polluting runoff and are a nationally-recognized method of protecting water quality. According to the City, the provisions restricting the pollutant constituents are only a small percentage of the 138 pollutants that the City is required to monitor under federal law. The restrictions on impervious cover and pollutant constituents, the City therefore urges, are clearly related to its goal of protecting the watershed from pollution in order to preserve water quality.

In light of the conflicting evidence presented at trial regarding the Ordinance, we cannot conclude that the Petitioners met their "extraordinary burden" of establishing that reasonable minds could not differ regarding whether the Ordinance was invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality. While Petitioners presented evidence tending to establish that prior water control ordinances were sufficient such that the Ordinance was not necessary, the City's evidence regarding the excessive grant of variances under the prior measure precludes a determination that reasonable minds could not differ on the need for the Ordinance.

The trial testimony conflicts regarding a landowner's ability to comply with the Ordinance. The Petitioners offered scientific testimony attempting to establish that it was virtually impossible to comply with the Ordinance, but this testimony was refuted by the City. Moreover, the City also presented the testimony of two developers that, not only did the City approve their developments under the Ordinance, they actually anticipate profitable returns on their investments. The conflict in this evidence demonstrates that reasonable minds could indeed differ on whether compliance with the Ordinance is possible.

While the Petitioners decry the lack of a variance procedure in the Ordinance, the Ordinance does actually provide a limited variance to keep the Ordinance from running afoul of federal and state laws. Moreover, the Petitioners' complaint regarding the lack of a variance procedure ignores the evidence that the excessive grant of variances under prior water control measures had undercut their effectiveness.

We perceive that the real crux of the Petitioners' complaint is that the Ordinance unreasonably reduces property values and requires excessive expenditures in order to comply with its provisions. The Petitioners established that the Ordinance will result in at least a $225 million decrease in property values in regulated areas, and that the Ordinance has caused some parcels of land to lose ninety percent of their value. The City has not refuted this evidence.

However, in this case, the fact that the Ordinance severely impacts some property values does not make it invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality. While the Ordinance's impervious cover limitations undoubtedly substantially affect the value of some property parcels, such limitations are a nationally-recognized method of preserving water quality. Fur-

ther, it is indisputable that limiting pollutants in runoff water will aid in preserving water quality. We therefore conclude that the Ordinance's provisions are rationally related to its goal of protecting water quality.

■ Because we have concluded that the Ordinance is rationally related to the governmental interest in protecting water quality, the City has the right to significantly limit development in watershed areas in furtherance of this interest. *See Day–Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 424, 72 S.Ct. 405, 96 L.Ed. 469 (1952). A governmental regulation can restrict, or even take, property for such a public benefit; however, if the regulation of property rights goes too far, compensation must be provided. *See Barshop,* 925 S.W.2d at 628. To the extent that the City's limitations on development deny all economically viable use of property or unreasonably interfere with the right to use and enjoy property, affected property owners may have a remedy in takings law. *See Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 935 (Tex.1998)(recognizing that a compensable taking can occur if a governmental regulation totally destroys a property's value or if the regulation has a severe enough economic impact and the regulation interferes with distinct investment-backed expectations). Such a challenge is not part of this lawsuit. Our holding today that the Ordinance is not invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality accordingly has no impact on any potential claim that the Ordinance unconstitutionally interferes with a landowner's property rights.

## III

■ The Petitioners next attack the court of appeals' conclusion that the Ordinance is not void under sections 212.002 and 212.003 of the Local Government Code. Local Government Code section 212.002 provides:

After a public hearing on the matter, the governing body of a municipality may adopt rules governing plats and subdivisions of land within the municipality's jurisdiction to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful development of the municipality.

TEX. LOC. GOV'T CODE § 212.002. Local Government Code section 212.003 provides in pertinent part:

(a) The governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of municipal ordinances adopted under Section 212.002 and other municipal ordinances relating to access to public roads. However, unless otherwise authorized by state law, in its extraterritorial jurisdiction a municipality shall not regulate:

(1) the use of any building or property for business, industrial, residential, or other purposes;

(2) the bulk, height, or number of buildings constructed on a particular tract of land;

(3) the size of a building that can be constructed on a particular tract of land, including without limitation any restriction on the ratio of building floor space to the land square footage; or

(4) the number of residential units that can be built per acre of land.

*Id.* § 212.003.

Petitioners argue that (1) sections 212.002 and 212.003 govern the Ordinance, (2) the Ordinance was enacted without a public hearing in violation of section 212.002, and (3) the Ordinance effectively violates the prohibitions in section 212.003 by regulating the use, bulk, height, number, or size of buildings. Petitioners accordingly advocate that the trial court correctly held that the Ordinance was void. The City responds that sections 212.002

and 212.003 do not apply because these sections are zoning statutes and the Ordinance is a water pollution control measure. We agree with the City.

By their express terms, sections 212.002 and 212.003 apply to ordinances that "govern plats and subdivisions of land." Further, the statutes' legislative history indicates that they govern a city's zoning authority, not a city's authority to apply water quality requirements. For instance, House Bill 3187, which amended section 212.003, "prohibits the application of zoning regulations in ETJ areas." COMMITTEE ON URBAN AFFAIRS, BILL ANALYSIS, Tex. H.B. 3187, 71st Leg., R.S. (1989). In fact, the Legislature made it clear that section 212.003 was not intended "to affect the ability of a municipality to apply water control requirements" in its extraterritorial jurisdiction. CONFERENCE COMMITTEE REPORT, Tex. H.B. No. 3187, 71st Leg., R.S. (1989). We therefore conclude that sections 212.002 and 212.003 apply only to zoning statutes, not water control measures such as the Ordinance.

██ Petitioners nevertheless assert that the Ordinance is, in effect, a zoning ordinance, not a water control ordinance. Petitioners argue that the Ordinance's impervious cover limitations effectively constitute a regulation on the use, bulk, height, number, and size of buildings in the City's extraterritorial jurisdiction in violation of section 212.003. Petitioners contend that we should consider the actual effect of the Ordinance, not its stated purpose, in determining whether the Ordinance must comply with these statutes.

However, we disagree with Petitioners' assertion that the Ordinance effectively constitutes a zoning regulation. The Ordinance's stated goal is to protect and preserve a "clean and safe drinking water supply" and "to prevent further degradation of the water quality in Barton Creek, Barton Springs, and the Barton Springs Edwards Aquifer." While the Ordinance clearly has effects on land use through its imposition of impervious cover limitations, these cover limitations are typical features in ordinances protecting water quality. Indeed, as discussed previously, such cover limitations are a nationally-recognized method of preserving water quality, and therefore we conclude that the cover limitations further the Ordinance's stated goal. On balance, the Ordinance is not a zoning regulation seeking to shape urban development, but rather is a measure designed to protect water quality. We accordingly hold that the requirements of sections 212.002 and 212.003 are not applicable to the Ordinance, and the Ordinance cannot be invalidated by these statutes.

### IV

██ Petitioners also complain that the court of appeals erred in holding that the Ordinance is effective without the City first obtaining approval from the Texas Natural Resource Conservation Commission. Section 26.177(a) of the Water Code allows municipalities with populations in excess of five thousand to establish water pollution control and abatement programs. Section 26 .177(c) provides in pertinent part:

> The water pollution and abatement program ... must be submitted to the [Texas Natural Resource Conservation] commission for review and approval. The commission may adopt rules providing the criteria for the establishment of those programs and the review and approval of those programs.

TEX. WATER CODE § 26.177(c).

Petitioners argue that the Legislature clearly contemplated by the phrase "review and approval" that the Texas Natural Resource Conservation Commission would actually approve a city's water pollution and abatement control program before the program could become effective. Otherwise, Petitioners maintain that a city ordinance would remain effective even if the Commission later expressly disapproved the ordinance. Additionally, Petitioners

rely on the statute's bill analysis, which stated that:

> Current law requires the preparation of pollution abatement plans by cities ... but does not require submittal, review and approval of the plans. There is currently no requirement for cities to notify anyone when a pollution abatement plan is established. Water pollution abatement plans, when properly prepared, can be beneficial in reducing water pollution. However, if a city fails to submit a plan, or submits an inadequate plan, there is no procedure for carrying out the intent of the law. This bill would provide for direct Texas Water Commission oversight of pollution abatement plans.

SENATE NATURAL RESOURCES COMM., BILL ANALYSIS, Tex. H.B. 1546, 71st Leg., R.S. (1989). Petitioners assert that the Commission cannot "provide oversight" of the pollution abatement plans if the plans can become effective before approval is obtained. Because the Ordinance undisputedly has not yet been approved by the Commission, Petitioners urge that it is not effective.

The City responds that its own charter prescribes when ordinances become effective. Any legislative limits on the City's authority to control the effective date of its ordinances cannot be implied, but must be set forth with unmistakable clarity. *Lower Colorado River Auth. v. City of San Marcos*, 523 S.W.2d 641, 643–45 (Tex. 1975). According to the City, section 26.177(c) does not state with unmistakable clarity that a water pollution control ordinance is not effective until the Commission approves it. Moreover, the City maintains that the statute's legislative history supports its position. The City also points out that the Commission itself considers any ordinance submitted for review to be effective prior to Commission approval. Indeed, the Commission has filed an amicus curiae brief in this Court requesting that we affirm the court of appeals' holding on this issue.

The City of Austin is a home-rule city deriving its power from article XI, section 5 of the Texas Constitution. A home-rule city is not dependent on the Legislature for a grant of authority. *Lower Colorado River Auth.*, 523 S.W.2d at 643. Rather, the Legislature may provide limits on the power of home-rule cities, but only if the limitation appears with "unmistakable clarity." *Id.* at 645; *City of Sweetwater v. Geron*, 380 S.W.2d 550, 552 (Tex. 1964).

Under Austin's city charter, the Ordinance is effective. Accordingly, unless the Legislature limited the City's authority to set the Ordinance's effective date with unmistakable clarity in section 26.177(c), the Ordinance does not require Commission approval before it becomes effective. We conclude that the Legislature has not so limited the City's authority.

While section 26.177(c) states that a water pollution or abatement program must be submitted to the Commission for "review and approval," the statute is silent as to whether the program is effective pending approval. We find this silence significant because, in other Water Code sections, the Legislature has specifically stated that an act was not effective until the Commission approved it. For instance, section 11.121 of the Water Code provides that any project for "the storage, taking, or diversion of water" shall not begin *"without first obtaining a permit from the commission."* TEX. WATER CODE § 11.121 (emphasis added). Similarly, section 26.032, which has since been repealed, stated that *"[b]efore* the order, resolution, or other rule *becomes effective,* the county shall submit it to the commission and obtain the commission's written approval." Act of May 26, 1985, 69th Leg., R.S., ch. 795, § 1.079(c), 1985 Tex. Gen. Laws 2760 (emphasis added), *repealed by* Act of June 17, 1987, 70th Leg., R.S., ch. 406, § 2, 1987 Tex. Gen. Laws 1938. Thus, while the Legislature clearly was well-versed in drafting statutes that explicitly provided that a local act was not

effective until approved by the Commission, the Legislature chose not to include such an express provision in section 26.177(c). We presume that this omission has a purpose. *See Cameron v. Terrell & Garrett,* 618 S.W.2d 535, 540 (Tex.1981). The only purpose that we can ascribe for such an omission is that the Legislature did not intend that water pollution programs such as the Ordinance require Commission approval before becoming effective.

Section 26.177(c)'s legislative history also supports our holding. The author of the bill that added the review and approval provision stated that the provision was not intended to take away local control, but was designed to gather information and to assist cities in developing their programs. Debate on Tex. H.B. 1546 on the Floor of the House, 71st Leg., R.S., Floor Tape 72, Side 2 (May 2, 1989)(remarks of Representative Terral Smith). *See also* Hearing on Tex. H.B. No. 1546 before the House Resources Committee, 71st Leg., R.S., House Tape Excerpts, Tape 2–B (March 22, 1989)(Executive Director of the Commission testified that the Commission viewed the legislation as establishing an information-gathering process). Nothing in the bill analysis relied upon by the Petitioners compels a contrary conclusion.

Finally, we note that our holding is consistent with the Commission's interpretation of the statute. While not controlling, the contemporaneous construction of a statute by the administrative agency charged with its enforcement is entitled to great weight. *State v. Public Util. Comm'n,* 883 S.W.2d 190, 196 (Tex.1994); *Dodd v. Meno,* 870 S.W.2d 4, 7 (Tex.1994). According to the Commission's amicus brief, the Commission has refrained from acting on submitted water pollution control and abatement programs until it can analyze and adopt rules and standards to guide its consideration. Therefore, a holding that a water pollution control and abatement program requires pre-approval by the Commission would essentially render ineffective every municipality's program passed since 1989. This is a result that we cannot presume the Legislature intended by enacting section 26.177(c).

## V

■ Petitioners next urge that the Ordinance is invalid because it is not a proper subject of the initiative and referendum process under Austin's city charter. Article IV, section 1 of the City's charter contains the following provision regarding legislation by public initiative:

> The people of the city reserve the power of direct legislation by initiative, and in the exercise of such power may propose any ordinance, not in conflict with this Charter, the state constitution, or the state laws except an ordinance appropriating money or authorizing the levy of taxes.

Austin City Charter art. IV, § 1.

Petitioners assert that the Ordinance conflicts with article X of the City's charter. Article X mandates the implementation of a comprehensive plan to guide, regulate, and manage development to assure the most beneficial use of land, water, and other natural resources. Article X also establishes a planning commission which "shall" review and make recommendations on proposals to "adopt or amend land development regulations," including "zoning, subdivision, building and construction, environmental and other police power regulations controlling, regulating, or affecting the use or development of land." Austin City Charter art. X, § 4. Finally, the charter provides that the city council may adopt amendments to the comprehensive plan only after at least one public hearing. *Id.* § 5. Petitioners claim that these provisions of the charter remove water pollution regulations, such as the Ordinance, from the domain of citizen initiators. The City responds that such a withdrawal of the power of initiative must be clearly stated, and no such clear statement exists in this case.

Charter provisions are to be liberally construed in favor of the power of initiative and referendum. *Glass v. Smith,* 150 Tex. 632, 244 S.W.2d 645, 649 (1951); *Taxpayers' Ass'n of Harris County v. City of Houston,* 129 Tex. 627, 105 S.W.2d 655, 657 (1937). While the initiative power may be either expressly or impliedly limited by the city charter, such a limitation will not be implied unless the provisions of the charter are clear and compelling. *Glass,* 244 S.W.2d at 649.

Petitioners make no contention that the Austin city charter expressly provides that a water control regulation, such as the Save Our Springs Ordinance, may not be adopted by the people at an initiative election. Rather, Petitioners claim that, because the charter requires a comprehensive plan to regulate development and a planning commission to review development proposals, the subject matter of the Ordinance has been implicitly withdrawn from the people. However, such an implicit withdrawal must be "clear and compelling." The provisions of article X do not clearly compel the conclusion that the Ordinance cannot be passed through the initiative and referendum process. The planning commission's review and recommendation powers over development can reasonably coexist with the adoption of a water quality regulation through public initiative. Indeed, article X does not grant the planning commission the power to establish a water pollution and abatement program under section 26.177(d) of the Water Code. Accordingly, we hold that the SOS Ordinance was a proper subject of the initiative and referendum process.

## VI

Petitioners finally contend that the court of appeals erred by holding that only projects where the original permit applications were filed after September 1, 1987 were required to be considered on the basis of the City's regulations and ordinances in effect at that time. Circle C made applications for preliminary subdivision approval for five different sections of the Circle C development, four of which were filed in 1985 and the fifth of which was filed in 1992. In furtherance of its ongoing development from these permit applications, Circle C applied for site development permits after the enactment of the Ordinance.

The trial court concluded that, under former section 481.143 of the Government Code, the ordinances in effect when Circle C filed its original permit applications in 1985 and 1992 governed the City's consideration of Circle C's subsequent permit applications for the same development. The court of appeals, however, modified the trial court's judgment, holding that because section 481.143 became effective September 1, 1987, only initial permits filed between September 1, 1987 and the effective date of the Ordinance (August 10, 1992) were not subject to the strictures of the Ordinance. Circle C contends that the court of appeals erred in modifying the trial court's judgment.

Generally, the right to develop property is subject to intervening regulations or regulatory changes. *Connor v. City of University Park,* 142 S.W.2d 706, 709 (Tex.Civ.App.—Dallas 1940, writ ref'd). In adopting sections 481.141–.143 of the Texas Government Code on September 1, 1987, the Texas Legislature significantly altered this rule by locking in for the life of a project the regulations in effect at the time of the application for the project's first permit. The version of section 481.143 in effect at the time of the dispute provided:

> The approval, disapproval, or conditional approval of an application for a permit shall be considered by each regulatory agency solely on the basis of any orders, regulations, ordinances, or other duly adopted requirements in effect at the time the original application for the permit is filed. If a series of permits is required for a project, the orders, regulations, ordinances, or other requirements in effect at the time the original

application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project.

Act of June 16, 1987, 70th Leg., R.S., ch. 374, § 1, 1987 Tex. Gen. Laws 1838–39, *amended by* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147, *repealed by* Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3966.

However, the Legislature repealed section 481.143 while this case was pending before this Court. Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3966. Because of this repeal, we conclude that we cannot address Circle C's argument that the court of appeals erred in its modification of the trial court's judgment.

When a cause of action is based on a statute, the repeal of that statute without a savings clause for pending suits is usually given immediate effect. *Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382, 384 (Tex.1982). Ordinarily, all suits filed in reliance on the statute must cease when the repeal becomes effective; if final relief has not been granted before the repeal goes into effect, final relief cannot be granted thereafter, even if the cause is pending on appeal. *Knight*, 627 S.W.2d at 384; *National Carloading Corp. v. Phoenix–El Paso Express, Inc.*, 142 Tex. 141, 176 S.W.2d 564, 568 (1943); *Dickson v. Navarro County Levee Improvement Dist. No. 3*, 135 Tex. 95, 139 S.W.2d 257, 259 (1940). The repeal of the statute in such instances deprives a court of subject matter jurisdiction over the cause. *See Knight*, 627 S.W.2d at 384; *Dickson*, 139 S.W.2d at 259.

The Legislature, in its repeal of section 481.143, did not include a savings clause providing that section 481.143 remained in effect for pending litigation. Accordingly, we must give its repeal immediate effect, and we cannot review Circle C's argument that the court of appeals erred in concluding that its original permit applications filed before September 1, 1987 were not covered by section 481.143.

We were confronted with a similar situation in *Dickson v. Navarro County Levee Improvement Dist. No. 3*, 135 Tex. 95, 139 S.W.2d 257 (1940). In *Dickson*, a bondholder instituted suit to collect delinquent taxes owed by the defendants to a levee improvement district under a statute allowing holders of bonds issued by such districts to commence suit if the district failed to do so within sixty days after the taxes became delinquent. The trial court rendered judgment in favor of the bondholder, and defendants appealed. While the case was pending in the court of appeals, the Legislature repealed the statute allowing bondholders to bring such actions. *Id.* at 259. The court of appeals nevertheless affirmed the trial court's judgment for the bondholder, but this Court vacated the appellate court's judgment and dismissed the cause. *Id*. at 260. We reasoned that the Legislature's repeal of the statute precluded the bondholder from maintaining the suit because the Legislature had not incorporated a savings clause in the repealing statute. *Id.* at 259.

We similarly cannot review Circle C's claim that the court of appeals erred by holding that section 481.143 did not apply to subsequent permit applications when the original permit application was filed before September 1, 1987. Because the Legislature did not include a savings provision in its repeal of section 481.143, we must give the repeal immediate effect since Circle C had not obtained "final relief" prior to the repeal.

However, no party challenged the court of appeals' holding that section 481.143 applied to Circle C's original permit applications filed after September 1, 1987. The court of appeals' holding on this issue therefore constituted "final relief" in Circle C's favor. When "final relief" has been granted before the repeal of a statute, the relief is not usually affected by the stat-

ute's subsequent repeal, unless the Legislature has provided to the contrary. *Cf. Knight,* 627 S.W.2d at 384.

In sum, we dismiss Circle C's point of error challenging the court of appeals' modification to the trial court's judgment. However, that portion of the court of appeals' judgment holding that any permit Circle C required be considered on the basis of the ordinances in effect when the original application for preliminary subdivision approval was filed, as long as the original application was filed after September 1, 1987, remains intact as it was not challenged in this Court.

## VII

As a final matter, we must consider Save Our Springs Alliance's argument that the trial court erred in striking its plea in intervention and the court of appeals erred in affirming the trial court's striking of its intervention. The Alliance, comprised of the citizen initiators of the Save Our Springs Ordinance, maintains that the City could not adequately defend the Ordinance in court because the City had consistently opposed the Ordinance and had vigorously defended the previous water control ordinances that had been in place. Further, the Alliance points out that the City had opposed the legality of the Ordinance in open court and attempted to preclude a vote on the Ordinance. *See City Council of Austin v. Save Our Springs Coalition,* 828 S.W.2d 340 (Tex. App.—Austin 1992, no writ)(citizens sued City to force election on the Ordinance). Under these circumstances, the Alliance urges that its intervention was essential to protect its interests. *See Guaranty Fed. Savings Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 657 (Tex.1990)(trial court abuses its discretion in striking intervention when (1) the intervenor, in its own name, could have either brought, or defended and defeated the same action; (2) the intervention will not complicate the case by an excessive multiplication of the issues; and (3) the intervention is almost

essential to effectively protect the intervenor's interest). The Alliance contends that the court of appeals erred in concluding that the City could adequately protect its interests. The Alliance further asserts that citizen initiative sponsors have an absolute right to intervene in litigation involving the initiated legislation.

However, we do not believe it is necessary to reach the merits of the Alliance's argument. Even assuming the trial court erred in striking the Alliance's intervention and the court of appeals erred by affirming the trial court's action, the error was harmless. Under the Texas Rules of Appellate Procedure, no judgment may be reversed on appeal unless we conclude that the error complained of probably caused the rendition of an improper judgment. Tex. R. App. P. 61.1. The Alliance admits that the only remedy for the alleged improper striking of its intervention is a new trial. Because the City has prevailed in upholding the Ordinance against all the challenges raised by Petitioners, a new trial would do nothing to further the Alliance's interests. We accordingly conclude that any alleged error in striking the Alliance's intervention was harmless.

\*     \*     \*     \*     \*     \*

For the foregoing reasons, we affirm the court of appeals' judgment holding that the Ordinance is a valid legislative act that need not be approved by the Texas Natural Resource Conservation Commission to become effective and enforceable. We dismiss Circle C's point of error regarding the court of appeals' modification of the trial court's judgment with regard to section 481.143 of the Government Code because Circle C did not obtain final relief prior to the repeal of section 481.143.

Justice ENOCH filed a concurring opinion.

Justice ENOCH, concurring.

I join in the Court's opinion and in the judgment. I write separately only to mention one facet of this case that troubles me:

by conferring on Austin the authority to control land use outside its boundaries, the Legislature has partially disenfranchised a class of citizens. This disenfranchisement is at its most obvious in this case, in which the citizens of one community by their vote have placed land use restrictions on citizens of neighboring communities who had no vote. It is also a disenfranchisement that may very well violate the "one man, one vote" principle inherent in the right to participate in the political process and guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 68, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978).

In *Holt,* the United States Supreme Court decided that the City of Tuscaloosa's extraterritorial jurisdiction, which extended police jurisdiction and sanitary regulations over several unincorporated areas, did not violate the voting rights of those areas' residents. *Id.* at 70, 99 S.Ct. at 389-90. The Court declined to invalidate the extraterritorial jurisdiction because of "the extraordinarily wide latitude that States have in creating various types of political subdivisions and conferring authority upon them." *Id.* at 71, 99 S.Ct. at 390. But however wide the states' latitude is, it is not without boundaries, and two aspects of the *Holt* opinion indicate that this case might be distinguishable.

First, the jurisdictional extension in *Holt* provided substantial benefits to the residents in the form of municipal services such as police, fire, and health protection. *See id.* at 74, 99 S.Ct. at 392. Second, the Court stated that an extraterritorial-jurisdiction statute conferring broader powers than those at issue in *Holt* could run afoul of the "one man, one vote" principle. *See id.* at 72 n. 8, 99 S.Ct. at 391; *id.* at 79, 99 S.Ct. at 394-95 (Stevens, J., concurring) (noting the Court's "limited" holding and stating that extraterritorial jurisdiction "might sometimes operate to deny the franchise to individuals who share the interests of their voting neighbors").

In this case, by contrast, the Petitioners appear to bear most of the burdens and the City appears to enjoy most of the benefits. Perhaps the extraterritorial jurisdiction at issue here is onerous enough to violate the Petitioners' constitutional rights. However, though they hint at it, the Petitioners do not brief this issue, and the Court properly omits considering it. *See* Tex. R. App. P. 38.1(h). On the other hand, I think that this is a serious question that should be kept in mind.

Justice ABBOTT delivered the opinion of the Court on Motion for Rehearing as to Section VI, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, and Justice GONZALES join.

We granted Petitioners' Motion for Rehearing. We now withdraw Part VI of our opinion and substitute the following.

## VI

Petitioners finally contend that the court of appeals erred by holding that only projects in which the original permit applications were filed after September 1, 1987 are required to be considered on the basis of the City's regulations and ordinances in effect at the time the original permit applications were filed. Circle C made applications for preliminary subdivision approval for five different sections of the Circle C development, four of which were filed in 1985 and the fifth of which was filed in 1992. In furtherance of its ongoing development from these permit applications, Circle C applied for site development permits after the enactment of the Ordinance. These subsequent permit applications are at issue.

The trial court concluded that, under former section 481.143 of the Government Code, the ordinances in effect when Circle C filed its original permit applications in 1985 and 1992 governed the City's consideration of Circle C's subsequent permit applications for the same development. The court of appeals, however, modified

the trial court's judgment, holding that because section 481.143 became effective September 1, 1987, only projects in which the initial permits were filed between September 1, 1987 and the effective date of the Ordinance (August· 10, 1992) were not subject to the strictures of the Ordinance. Petitioners contend that the court of appeals erred in modifying the trial court's judgment in this manner.

Generally, the right to develop property is subject to intervening regulations or regulatory changes. *See Connor v. City of University Park*, 142 S.W.2d 706, 709 (Tex.Civ.App.—Dallas 1940, writ ref'd). In adopting sections 481.141–.143 of the Texas Government Code on September 1, 1987, the Texas Legislature significantly altered this rule by requiring that each permit in a series required for a development project be subject to only the regulations in effect at the time of the application for the project's first permit, and not any intervening regulations. The stated purpose of the statute was to establish requirements relating to the processing and issuance of permits and approvals by governmental regulatory agencies in order to alleviate bureaucratic obstacles to economic development. *See* Act of May 30, 1987, 70th Leg., R.S., ch. 374, § 1, sec. 7.001(2), 1987 Tex. Gen. Laws 1823, 1838, *amended by* Act of May 24, 1997, 74th Leg., R.S., ch. 794, § 1, sec. 481.141(b), 1995 Tex. Gen. Laws 4147, 4147, *repealed by* Act of June 1, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966. The version of section 481.143 in effect at the time of the dispute provided:

> The approval, disapproval, or conditional approval of an application for a permit shall be considered by each regulatory agency solely on the basis of any orders, regulations, ordinances, or other duly adopted requirements in effect at the time the original application for the permit is filed. If a series of permits is required for a project, the orders, regulations, ordinances, or other requirements in effect at the time the original

application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of. the project.

Act of May 30, 1987, 70th Leg., R.S., ch. 374, § 1, sec. 7.003(a), 1987 Tex. Gen. Laws 1823, 1839, *amended by* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, sec. 481.143, 1995 Tex. Gen. Laws 4147, 4147, *repealed by* Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966.

The Legislature repealed section 481.143 while this case was pending before this Court. *See* Act of June 1, 1997, 75th Leg., R .S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966. The general rule is that when a statute is repealed without a savings clause limiting the effect of the repeal, the repeal of that statute is usually given immediate effect. *See Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382, 384 (Tex.1982). When a right or remedy is dependent on a statute, the unqualified repeal of that statute operates to deprive the party of all such rights that have not become vested or reduced to final judgment. Ordinarily, all suits filed in reliance on the statute must cease when the repeal becomes effective; if final relief has not been granted before the repeal goes into effect, final relief cannot be granted thereafter, even if the cause is pending on appeal. *See id.; National Carloading Corp. v. Phoenix–El Paso Express, Inc.*, 142 Tex. 141, 176 S.W.2d 564, 568 (1943); *Dickson v. Navarro County Levee Improvement Dist. No. 3*, 135 Tex. 95, 139 S.W.2d 257, 259 (1940). The repeal of the statute in such instances deprives a court of subject matter jurisdiction over the cause. *See Knight*, 627 S.W.2d at 384; *Dickson*, 139 S.W.2d at 259.

This common-law rule of abatement may be modified by a specific savings clause in the repealing legislation or by a general savings statute limiting the effect of repeals. Most states, including Texas,

have adopted some form of general savings statute. *See* Ruud, *The Savings Clause— Some Problems in Construction and Drafting*, 33 TEX. L. REV. 285, 296–97 (1955). Texas's general savings clause is codified in section 311.031 of the Government Code, which states:

(a) Except as provided by Subsection (b), the reenactment, revision, amendment, or repeal of a statute does not affect:

(1) the prior operation of the statute or any prior action taken under it;

(2) any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred under it;

(3) any violation of the statute or any penalty, forfeiture, or punishment incurred under the statute before its amendment or repeal; or

(4) any investigation, proceeding, or remedy concerning any privilege, obligation, liability, penalty, forfeiture, or punishment; and the investigation, proceeding, or remedy may be instituted, continued, or enforced, and the penalty, forfeiture, or punishment imposed, as if the statute had not been repealed or amended.

(b) If the penalty, forfeiture, or punishment for any offense is reduced by a reenactment, revision, or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended.

TEX. GOV'T CODE § 311.031(a), (b).

Petitioners assert that the general savings provision of the Code Construction Act applies to the repeal of section 481.143. *See* TEX. GOV'T CODE § 311.002 (application of the Code Construction Act); *Knight*, 627 S.W.2d at 385. The City argues that the general savings clause does not apply because a much narrower specific savings clause is included in section 52 of the repealing legislation, which provides:

The rules, policies, procedures, and decisions of the Texas Department of Commerce are continued in effect as rules, policies, procedures, and decisions of the Texas Department of Economic Development until superseded by a rule or other appropriate action of the Texas Department of Economic Development. The validity of a rule, form, or procedure adopted, contract or acquisition made, proceeding begun, obligation incurred, right accrued, or other action taken by or in connection with the authority of the Texas Department of Commerce before it is abolished under ... this section is not affected by this Act. To the extent those actions continue to have any effect on or after September 1, 1997, they are considered to be the actions of the Texas Department of Economic Development.

Act of June 1, 1997, 75th Leg., R.S., ch. 1041, §§ 52(g), 52(h), 1997 Tex. Gen. Laws 3943, 3967. The City argues that because the repealing legislation contains a specific savings clause, application of the general savings provision is preempted. *See Ex parte Mangrum*, 564 S.W.2d 751, 755 (Tex. Crim.App.1978) ("The general savings clause of the Code Construction Act, however, is inapplicable to the new Penal Code because a specific savings clause was provided by the Legislature."); *Scott v. State*, 916 S.W.2d 40, 41 (Tex.App.—Houston [1st Dist.] 1995, no pet.); *Wilson v. State*, 899 S.W.2d 36, 38 (Tex.App.—Amarillo 1995, pet. ref'd); *see also* TEX. GOV'T CODE § 311.026.

We conclude that section 52 contains a specific savings clause. But the existence of the specific savings clause does not preclude application of the general savings provision of the Code Construction Act to the repeal of section 481.143.

The Legislature's adoption of the general savings clause in the Code Construction Act indicates a general legislative policy that the repeal of any statute shall not affect the prior operation of that statute nor extinguish any liability incurred or

affect any right accrued or claim arising before the repeal takes effect. Given this general policy and the broad applicability of the Code Construction Act, we will presume that the general savings clause applies unless a contrary legislative intent is shown by clear expression or necessary implication. *See Great N. Ry. Co. v. United States*, 208 U.S. 452, 465, 28 S.Ct. 313, 52 L.Ed. 567 (1908) ("[T]he provisions of [the general savings clause] are to be treated as incorporated in and as a part of subsequent enactments, and therefore under the general principles of construction requiring, if possible, that effect be given to all parts of a law the section must be enforced unless either by express declaration or necessary implication, arising from the terms of the law, as a whole, it results that the legislative mind will be set at naught by giving effect to the provisions of [the general savings clause]."). Here, no contrary legislative intent is expressed or implied by section 52.

■ Section 52 does not expressly state that only the enumerated items are saved, nor does it expressly negate application of the general savings statute. *See State v. Fenter*, 89 Wash.2d 57, 569 P.2d 67, 70 (1977) (en banc) ("Although [the specific savings clause] exempts three categories from repeal and thus acts as a mini-savings statute, it does not expressly state that these three categories are the only three categories exempt from repeal. Therefore, we find no express legislative intent that the general savings statute … does not apply [to the repealed statute]."). Nor is application of the general savings clause negated by necessary implication. Although in many cases it could be argued that the Legislature's inclusion of a specific savings clause despite its awareness of the existence of the general savings clause renders the specific savings clause redundant, *see State v. Showers*, 34 Kan. 269, 8 P. 474, 477 (1885), that is not the case here. The specific savings clause in section 52 is not redundant of the general savings provision. The purpose of Senate Bill 932, which repealed section 481.143, was to "abolish[ ] the Texas Department of Commerce and transfer[ ] its powers and duties to the newly created Texas Department of Economic Development and to certain other economic development programs." Act of June 1, 1997, 75th Leg., ch. 1041, 1997 Tex. Gen. Laws 3943, 3943. Sections 52(g) and (h) ensured that proceedings begun, rights accrued, and other actions taken by or in connection with the authority of the Texas Department of Commerce before it was abolished were not affected by the Act, and, as of the September 1, 1997 effective date of the Act, would be continued in effect as the actions of the newly created Texas Department of Economic Development. This result may not have been achieved by the general savings clause. Thus, both the general and specific clauses were needed to effectuate legislative intent.

Additionally, in contrast to the cases that have held that a specific savings clause "trumps" application of the general savings clause, the specific savings clause in section 52 does not irreconcilably conflict with the general savings clause. *See* TEX. GOV'T CODE § 311.026(a) (providing that a special provision prevails over a general provision only if the conflict between the provisions is irreconcilable). Accordingly, we conclude that the general savings clause applies to the repeal of section 481.143. Applying the clause, the prior operation of section 481.143 is not affected by the repeal, and we may address Petitioners' point of error.

### A

■ The parties do not dispute whether section 481.143 applies to subsequent permit applications when the original permit application was filed after September 1, 1987, such as the one application for preliminary subdivision approval filed in 1992. The issue we must decide is whether the statute is applicable to Circle C's subsequent permit applications filed after September 1, 1987, when the original ap-

plication in the series was filed *before* September 1, 1987, such as the four applications for preliminary subdivision approval filed in 1985. The City argues that, in order to apply the statute to original permit applications filed before September 1, 1987, the statute must be applied retroactively, and that the law disfavors such retroactive application. *See Houston Indep. Sch. Dist. v. Houston Chronicle*, 798 S.W.2d 580, 585 (Tex.App.—Houston [1st Dist.] 1990, writ denied); *see also* TEX. GOV'T CODE § 311.022 ("A statute is presumed to be prospective in its operation unless expressly made retroactive."). Because section 481.143 does not expressly or impliedly indicate that it has a retroactive effect, the City asserts that the court of appeals correctly concluded that the statute does not apply to original permit applications filed before September 1, 1987. 930 S.W.2d at 693. Petitioners respond that they are not requesting a retroactive application of section 481.143, but rather a prospective application of the law to Circle C's subsequent permits filed after September 1, 1987.

Our first task is to determine whether the Legislature has expressly prescribed the statute's proper reach. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The statute provides that if a series of permits is required for a project, the ordinances in effect at the time the original application for the first permit is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project. Nowhere does the statute require that the original application for the first permit in the series be filed after September 1, 1987. But neither does the statute expressly state that it will apply to projects in progress before that date. Thus, the plain language of the statute does not expressly delineate its reach.

Petitioners contend that the statute applies to the treatment of any subsequent permit application filed after September 1, 1987, regardless of when the first permit was filed. This construction is consistent with the plain language of section 481.143, which states that "the ... ordinances ... in effect at the time the original application for the first permit in that series is filed [the ordinances in effect in 1985 in this case] shall be the sole basis for consideration of all subsequent permits required for completion of the project [the subsequent permits filed by Circle C in 1992]."[1] Moreover, this construction complies with the Legislature's mandate to construe statutes liberally to achieve their purposes. *See* TEX. GOV'T CODE § 312.006. If we were to apply the construction urged by the City and the dissent, the statute would at least partially fail of its intended purpose to "alleviat[e] bureaucratic obstacles" that "inhibit the economic development of the state." Obviously, "current administrative practices" can present bureaucratic obstacles to both ongoing and future projects. If the statute only applies to projects in

---

1. Chapter 481 was amended in 1995. *See* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147, *repealed by* Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966. The 1995 amendments provided that section 481.143 applied "to all projects in progress on or commenced after the effective date of this subchapter as originally enacted." Act of May 24, 1995, 74th Leg., R.S. ch. 794, § 1, sec. 481.143(b), 1995 Tex. Gen. Laws 4147, 4147 (repealed). Although the 1995 amendments were expressly made retroactive to September 1, 1987, Circle C concedes that the amendments do not apply to its claims. *See* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 3, 1995 Tex. Gen. Laws 4147, 4148 ("Nothing in this Act shall be construed to diminish or impair the rights or remedies of any person or entity under a final judgment rendered by, or in any pending litigation brought in, any court concerning an interpretation of the provisions of Subchapter I, Chapter 481, Government Code."). Subchapter I was reenacted in 1999 as Local Government Code, Subtitle C, Title 7, Chapter 245, but the reenacted version contains a similar provision and is thus also inapplicable to this litigation. *See* Act of April 29, 1999, 76th Leg., R.S., ch. 73, § 4, 1999 Tex. Gen. Laws \_\_\_, \_\_\_ (to be codified at TEX. LOC. GOV'T CODE § \_\_\_). Moreover, given the Legislature's mandate, we do not consider the 1995 amendments in construing section 481.143 as enacted.

which initial permit applications are filed after the statute's effective date, the benefit of the statute would be denied to existing projects even though they too play a role in the State's economic development. Accordingly, we agree with Petitioners' construction of the statute.

■ Our next step is to determine whether this construction renders the statute retroactive, thereby invoking the presumption against retroactivity. *See Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. As the Supreme Court observed in *Landgraf v. USI Film Products,* "[w]hile statutory retroactivity has long been disfavored, deciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Id.* at 268, 114 S.Ct. 1483. The Court in *Landgraf* did not attempt to precisely define what constitutes a retroactive law, instead preferring a "functional" approach. The Court instructed:

A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have "sound ... instinct[s]," and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Id.* at 269–70, 114 S.Ct. 1483 (citations and footnote omitted).

Applying these principles, we conclude that our construction does not operate retroactively. Contrary to the court of appeals' conclusion, section 481.143 does not affect any applications for permits filed before September 1, 1987. That would be retroactive. But applying section 481.143 to subsequent permit applications filed after September 1, 1987, when the original permit application was filed before September 1, 1987, is not a retroactive application of the law. The statute operates prospectively on new permits for existing projects. It affects only new permits to be issued in the future. It does not annul or affect prior permits, or require the City to issue a permit retroactively.

When Circle C filed its original permit applications in 1985, the City's ordinances in effect at that time governed the City's evaluation of those applications. Although subsequent applications in the series required for a project would normally be subject to any new ordinances and regulations in effect at the time of their filing, the Legislature provided that these subsequent applications, if filed after September 1, 1987, would be governed by only the ordinances and regulations in effect at the time the original permit application was filed. Thus, when Circle C filed subsequent permit applications after September 1, 1987, the City was required to apply only the ordinances in effect in 1985 to those applications. The statute is not retroactive merely because it requires the City to evaluate future permits based on past law.

The dissent argues that application to existing projects is retroactive because it reaches back in time and attaches new legal consequences to past acts. But the only new legal consequences it attaches to prior acts is in determining which "orders, regulations, ordinances, and other requirements" may be applied in the future to new permits. The Legislature could have passed a law comprehensively setting out criteria for new permits. Instead, section 481.143 adopts by reference to original

permits the appropriate orders, regulations, ordinances, and other requirements to apply to new permits—those in effect at the time the original application for the first permit in the series was filed. As the *Landgraf* opinion states, "a statute 'is not made retroactive merely because it draws upon antecedent facts for its operation.'" *Id.* at 270 n. 24, 114 S.Ct. 1483 (quoting *Cox v. Hart,* 260 U.S. 427, 435, 43 S.Ct. 154, 67 L.Ed. 332 (1922)); *accord Regions Hosp. v. Shalala,* 522 U.S. 448, 456, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998); *General Dynamics Corp. v. Sharp,* 919 S.W.2d 861, 866 (Tex.App.—Austin 1996, writ denied); *American Home Assurance v. Texas Dep't of Ins.,* 907 S.W.2d 90, 94 (Tex.App.—Austin 1995, writ denied); *see also Walls v. First State Bank of Miami,* 900 S.W.2d 117, 121 (Tex.App.—Amarillo 1995, writ denied) (discussing *Landgraf*). Here, the statute merely draws upon an antecedent fact—the date of the first permit application—to determine what law will apply to subsequent permit applications.

Accordingly, we hold that the court of appeals erred in holding that only the subsequent permit applications from original permit applications filed after September 1, 1987 were governed by the ordinances in effect at the time of the original application.

**B**

■ That does not end our inquiry, however, for we must also consider the effect of the repeal on Circle C's rights. The general savings clause of the Code Construction Act saves both the prior operation of the statute and "any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or

incurred under it." Tex. Gov't Code § 311.031(a)(2).

We begin by identifying Circle C's rights under section 481.143. As we have concluded, by its terms, section 481.143 gives Circle C the right to have the City consider an application for a permit "solely on the basis of any orders, regulations, ordinances, or other duly adopted requirements in effect at the time the original application for the permit is filed," which in this case would be the regulations and ordinances in effect in 1985 when the original applications for preliminary subdivision approval were filed and approved.

The general savings clause saves this right only if it was acquired, accrued, or accorded under section 481.143 before the September 1, 1997 effective date of the repeal.[2] *See Iowa Dep't of Transp. v. Iowa Dist. Ct. for Buchanan County,* 587 N.W.2d 774, 776 (Iowa 1998) ("[O]ne relying on [the general savings clause] must demonstrate that the privilege he seeks to save is one that he possessed, or that had vested, or that had been granted prior to the date the statute providing such a privilege was repealed."). This right would not accrue until Circle C filed an application for a permit; it is only when an application is filed that the right granted by section 481.143 is due and attaches to the review of the application. As each subsequent application for a permit is filed, Circle C's right accrues with respect to that application. With respect to applications filed after the repeal of section 481.143, Circle C's right would not have accrued before the effective date of the repeal, and nothing is saved by the general savings clause. Thus, the City may not apply current regulations and ordinances to its evaluation of permit applications filed or approved dur-

**2.** It is unclear whether the terms "accorded" and "acquired" relate to rights. Certainly, not all terms in the general savings clause relate to rights—for example, incur, which generally means "become liable or subject to" would not refer to a party's rights. In addition, if we apply the general definition of "accord," which is "grant" or "allow," then any right of action granted or allowed by a statute would be saved despite a repeal, regardless of whether it had accrued before repeal. This cannot have been the Legislature's intent in enacting the general savings clause, for repeals of statutory causes of action would have no effect. Accordingly, we will apply these terms, but in the more limited sense of affording the right when due, rather than when granted.

ing the prior operation of section 481.143, but it may do so with respect to any applications filed after its repeal, subject, of course, to the effects, if any, of the statute as reenacted in 1999. *See* Act of April 29, 1999, 76th Leg., R.S., ch. 73, 1999 Tex. Gen. Laws 431 to be codified at TEX. LOC. GOV'T CODE § 245.001 et. seq.).

In sum, we hold that the general savings clause applies to the repeal of section 481.143. Considering Petitioners' point of error, we conclude that, under the 1987 version of section 481.143, any subsequent permit applications filed or approved between September 1, 1987 and September 1, 1997 are governed by only the rules, regulations, and ordinances in effect in 1985 when the original applications for preliminary subdivision approval were filed. Because we hold that this is not a retroactive application of the statute, we reverse the court of appeals' judgment in that regard, and we modify the judgment accordingly.

BAKER and Justice O'NEILL join.

Justice HANKINSON filed a dissenting opinion on rehearing as to Section VI, in which Justice ENOCH, Justice BAKER, and Justice O'NEILL join.

Justice HANKINSON, dissenting.

While I agree with the Court's resolution of the first issue we address on rehearing, I dissent from what I perceive to be its impermissible and unnecessary retroactive application of Texas Government Code § 481.143. For the reasons expressed by the court of appeals, 930 S.W.2d 678, 693, I would hold that for section 481.143 to apply to a particular series of permits, the first permit in the series must have been filed after the effective date of section 481.143.

> The presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other. It ought not to receive such a construction unless the words used are so clear, strong, and imperative that no other meaning can be annexed to them or unless the intention of the legislature cannot be otherwise satisfied.

*United States Fidelity & Guar. Co. v. United States ex rel. Struthers Wells Co.*, 209 U.S. 306, 314, 28 S.Ct. 537, 52 L.Ed. 804 (1908).

Texas has its own "well-entrenched legal hostility to retroactive laws." *Houston Indep. Sch. Dist. v. Houston Chronicle Publ'g Co.*, 798 S.W.2d 580, 585 (Tex. App.—Houston [1st Dist.] 1990, writ denied). "Texas law militates strongly against the retroactive application of laws," *id.*, and any doubts must be resolved against retroactive operation of a statute. *See Government Personnel Mut. Life Ins. Co. v. Wear*, 151 Tex. 454, 251 S.W.2d 525, 529 (1952). The Legislature has codified the presumption that statutes apply prospectively: "A statute is presumed to be prospective in its operation unless *expressly* made retroactive." Tex. Gov't Code § 311.022 (emphasis added).

The Court misconstrues the proper temporal reach of the statute before us. It seems reasonably clear to me that while section 481.143 is not retroactive on its face, the Court's application of it creates a retroactive effect that can easily be avoided. The Court creates this retroactive effect by applying a statute not effective until September 1, 1987, to permit applications originally filed in 1985. Section 481.143 has retroactive effect if applied in this manner—it reaches back before its effective date and attaches new legal consequences to past acts by changing what the law was before section 481.143 was enacted.

Before the Legislature enacted section 481.143, under well-established law cities could pass or amend ordinances in the proper exercise of their police power, and citizens were bound by those intervening ordinances even if they were passed while an application for a permit was pending. *See Connor v. City of Univ. Park*, 142

S.W.2d 706, 709 (Tex.Civ.App.—Dallas 1940, writ ref'd). Thus, permit applications were subject to any intervening ordinances and amendments. Section 481.143 essentially eliminated any intervening ordinances and amendments passed by any city, including changes to fire, electrical, plumbing, and mechanical codes designed to further public safety. For example, if someone filed an application for a building permit in 1970, under the Court's reading of section 481.143, that person would only have to meet the safety standards of 1970 when applying in 1987 for the next permit in the series, and any ordinances passed in the intervening seventeen years would have no effect. In this manner, the Court's reading attaches new legal consequences to the 1985 permit applications and retroactively changes the law governing those 1985 applications, which were filed before the Legislature enacted section 481.143 in 1987. This is not "merely draw[ing] upon an antecedent fact," as the Court proposes. And I must emphasize that the Court's reading is what creates the retroactive effect, not the language of the Legislature as expressed in the statute itself; the Court agrees that the statute "does not expressly delineate its reach." Precisely because section 481.143 contains no clear expression that it operates retroactively, and because the Code Construction Act mandates that statutes operate prospectively in the absence of such clear expression, we are bound to read the statute in a way that does not create a retroactive effect.

Moreover, the Legislature knows precisely how to make the statute retroactive—it did so by amending section 481.143 in 1995 so that the section then expressly applied to projects "in progress on or commenced after" September 1, 1987. Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147. That amendment bolsters the conclusion that we should not apply the 1987 version, which was not expressly retroactive, to have a retroactive effect. Thus, the Court's reading of the 1987 statute has the effect of making the 1995 amendments mere surplusage. The 1995 amendments also included an exemption for adopting the kind of codes affecting public safety mentioned above, highlighting that the Legislature is the proper body to decide what the best policy is and how best to redress particular problems.

The practical danger of ignoring the Legislature's policy choice, as expressed in the Code Construction Act, and applying section 481.143 retroactively, is that we have no idea what rules, regulations, ordinances, or orders will be affected. Section 481.143 applies not just to the city of Austin, or to all cities in Texas, but to every "agency, bureau, department, division, or commission of the state or any department or other agency of a political subdivision that processes and issues permits." TEX. GOV'T CODE § 481.142(4). The statute applies not just to land development projects, but to every "endeavor over which a regulatory agency exerts its jurisdiction and for which a permit is required before initiation of the endeavor." TEX. GOV'T CODE § 481.142(3). The definition of permit is equally broad: "'Permit' means a license, certificate, approval, registration, consent, permit, or other form of authorization required by law, rule, regulation, or ordinance . . . ." *Id.* § 481.142(2). In striving to reach its result in this particular case, the Court ignores the fact that the implications of its decision are unknown. I would argue that is precisely why the Legislature has codified its decision that statutes not be applied retroactively without the Legislature itself saying so, without it's having weighed the consequences after considering the potential effects of retroactivity and expressed its decision that those consequences are desirable. Courts simply are not empowered or endowed with the jurisdiction or the resources to make those kinds of open-ended policy decisions.

The Court struggles to find legislative intent on retroactivity where none is apparent and uses that phantom intent to

circumvent the express language of the Code Construction Act. Nothing in the language of the statute or its history supports the Court's assertion that the usual prospective reading would cause the statute to "at least partially fail of its intended purpose." Without some expression by the Legislature that it intended section 481.143 to apply to existing projects, how do we know whether it intended precisely the opposite, perhaps as part of a legislative compromise, or perhaps as a result of the Legislature's understanding that statutes operate prospectively in the absence of clear expression to the contrary. Moreover, how can we liberally construe a statute on a point on which the statute is admittedly silent, without any proof of legislative intent, and when the Code Construction Act unequivocally mandates the opposite of the Court's reading. Whether to apply a statute retroactively is, for very good reasons, a legislative policy choice:

> Because [prospectivity] accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations. Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits. Such a requirement allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule against which to legislate.

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 272–73, 114 S.Ct. 1483 (1994). Through the Code Construction Act, the Legislature has clearly expressed its policy choice that its laws will not operate retroactively without its own deliberation and manifest expression of the value of retroactivity in the statute at issue. Ignoring the Code Construction Act, especially in the absence of any statutory language or legislative history to the contrary, is, in my view, tantamount to legislating.

The Court points out that "[n]owhere does [the 1987] statute require that the original application for the first permit be filed after September 1, 1987." In the face of that legislative silence, and in light of the statutory presumption against retroactive application, I conclude we must apply the statute prospectively. Applying section 481.143 prospectively, I would hold that because section 481.143 was not effective until 1987, it did not apply to Circle C's 1985 applications for preliminary subdivision approval. I would further hold that section 481.143 governs Circle C's one application filed after the effective date of section 481.143 and before the SOS ordinance became effective, but that any other applications in that series must have been filed before section 481.143 was repealed for section 481.143 to govern those applications. Any other reading flouts our longstanding principles disfavoring retroactive lawmaking. Accordingly, I dissent.