ACCEPTED
03-15-00378-CV
7899900
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/19/2015 10:15:27 AM
JEFFREY D. KYLE
CLERK

No. 03-15-00378-CV

# In the

# Third Court of Appeals

# at Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/19/2015 10:15:27 AM
JEFFREY D. KYLE
Clerk

JAMES HANSEN
*Appellants*

v.

LONNIE ROACH and
BEMIS, ROACH & REED
*Appellees*

## APPELLEES' BRIEF

John R. Shepperd
State Bar No. 18236050
713-353-2010
713-784-7780 (fax)
John.shepperd@wilsonelser.com
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
909 Fannin Street, Suite 3300
Houston, TX 77010

Oral Argument Requested

2110219v.3

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . i

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . 1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . 10

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . 14

    A.    Standard of Review: Two Standards Apply . . . . . . . 14

        1.    Legal sufficiency standard of review applies
            to evidentiary rulings . . . . . . . . . . . . . . . 14

        2.    De Novo standard of review applies when
            interpreting the contract . . . . . . . . . . . . . 16

    B.    The trial court correctly held that Hansen's business
        ended on April 8, 2011 when he voluntarily surrendered
        his medical license . . . . . . . . . . . . . . . . . . . 17

        1.    The facts indicate the practice ended when
            Hansen surrendered his medical license . . . . . . 17

        2.    Hansen did nothing after the injury to continue
            his practice, and he took positive steps to end
            his practice . . . . . . . . . . . . . . . . . . . . 18

2110219v.3

C.    The Lower Courts Interpreted Hansen's DOE Policies Correctly . . . . . . . . . . . . . . . . . . . . . . . 20

    1.    The policy language defines when a practice ends and when DOE payments stop . . . . . . . . . . 20

    2.    The position of Texas courts on insurance policy exclusion provisions that are found to be ambiguous . . . . . . . . . . . . . . . . . . . 22

    3.    The Benefit Termination provision of Hansen's DOE policy is not ambiguous . . . . . . . . . . . 23

    4.    Hansen's interpretation of the Benefit Termination provision is unreasonable . . . . . . . . . . . . 28

D.    The Business Organizations Code is Irrelevant . . . . . . 31

    1.    The policy does not recognize a "winding up" period as a prerequisite to a business ending . . . . 31

    2.    Hansen cites no case law that says the Business Organizations Code applies . . . . . . . . . . . 33

    3.    Hansen cannot prevail even if the Business Organizations Code applies . . . . . . . . . . . 34

E.    Northwestern Mutual's Breach Does Not Entitle Hansen to All the Benefits Under the Policy . . . . . . . 36

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Certificate of Compliance with TRAP, Rule 9.4(i)(3) . . . . . . . 40

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . 40

# INDEX OF AUTHORITIES

## CASES

*Barnett v. Aetna Life Insurance Co.,* 723 S.W.2d 663, 666
(Tex. 1987) . . . . . . . . . . . . . . . . . . . 23, 28

*Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983) . . . . . . . . 16

*City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex. 2005) . . . . . 15

*Dow. Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex. 2001) . . . 14, 15

*El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,*
8 S.W.3d 309, 312 (Tex. 1999) . . . . . . . . . . 16

*Grider v. Mike O'Brien, P.C.,* 260 S.W.3d 49 (Tex. App.—
Houston [1st Dist.] 2008, pet. den.) . . . . . . . . 14

*Kelly-Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462,
464 (Tex. 1998) . . . . . . . . . . . . . . . 22, 23

*Mead v. Johnson Group, Inc.,* 615 S.W.2d 685, 689
(Tex. 1981) . . . . . . . . . . . . . . . . . . 36

*Milhouse v. Weisenthal,* 775 S.W.2d 626 (Tex. 1989) . . . . . . . 8, 9

*Quick v. City of Austin,* 7 S.W.3d 109, 116 (Tex. 1998) . . . . . . 16

*Paul Revere Life Insurance Company v. Klock,* 169 So.2d 493
(Fla. Ct. App. 1964) . . . . . . . . . . . . . . 24

*Principal Mutual Life Insurance Company v. Toranto,*
*1997* WL 279751 (N.D. Tex. 1997) . . . . . . . . 25, 26, 27, 28

*Waggoner v. Marrow,* 932 S.W.2d 627, 631 (Tex.App.
– Houston [14th Dist.] 1996, no writ) . . . . . . . . 16

2110219v.3

*Wilson v. Monarch Life Insurance Company,* 971 F.2d 312
    (9th Cir. 1992) . . . . . . . . . . . . . . . . . . 24, 25

## STATUTES AND CODES

TEX. BUS. ORG. CODE Chapt. 11.052 . . . . . . . . . . . . . . 34

TEX. BUS. ORG. CODE Chapt. 11.052(a) . . . . . . . . . . . . . 35

TEX BUS. ORG. CODE ANN. §301.003(2)(A) . . . . . . . . . . . 34

TEX BUS. ORG. CODE ANN. §301.006 . . . . . . . . . . . . . . 35

TEX BUS. ORG. CODE ANN. §301.007(a) . . . . . . . . . . . . . 35

TEX BUS. ORG. CODE ANN. §301.007(b) . . . . . . . . . . . . . 35

TEX BUS. ORG. CODE ANN. §301.007(e) . . . . . . . . . . . . . 35

2110219v.3

No. 03-15-00378-CV

# In the

# Third Court of Appeals

# at Austin, Texas

---

JAMES HANSEN
*Appellants*

v.

LONNIE ROACH and
BEMIS, ROACH & REED
*Appellees*

---

# APPELLEE'S BRIEF

---

Comes now Appellees Lonnie Roach and Bemis, Roach & Reed ("Roach") and files this Appellees' Brief.

## STATEMENT OF THE CASE

Appellees accept Appellant's Statement of the Case.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested by Appellees insofar as it was requested by Appellant.

1

## ISSUES PRESENTED

Appellees accept Appellant's Issues Presented.

## STATEMENT OF FACTS

On June 5, 2010, James Hansen, M.D., an Austin neurosurgeon, sustained an injury while biking. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts #1) Since this accident, Hansen has not performed surgery, seen patients or otherwise returned to his solo surgical practice. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts #s 16 – 18) Likewise, Hansen's P.A., Austin Neurosurgical & Spine Institute, P.A. ("P.A.") has not provided medical services to patients since that date. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 19)

Hansen was in solo practice, so he was the only member licensed to perform the type of service for which the P.A. was formed. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 35). Neither Hansen nor his P.A. employed any other neurosurgeons since the date of the accident to continue the operation of the business. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 20) Hansen has never had another neurosurgeon practicing with his P.A. before or after the accident. (Tab F, Jnt. Ex. 1,

2110219v.3

Joint Stipulation of Facts # 21) Hansen has not attempted to practice neurosurgery since the accident. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 22)

Regarding the dissolution of his practice, Hansen testified as follows in various depositions:

> **Q:** Now I know you closed your practice. When did you do that?
>
> **A:** Kind of officially about a month after my injury, so it would have been early July last year.

(Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 40)'

> **Q:** I understand you've closed your office?
>
> **A:** That is correct.
>
> **Q:** Do you currently have any employees in the practice of medicine?
>
> **A:** I don't have any employees. My corporation has no employees other than myself.

(Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 41)

> **Q:** Have you sent out a letter to all your patients advising them that you were closing your practice?
>
> **A:** Yes.

(Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 41)

> **Q:** Has anything changed with regard to your condition that suggests that you plan to return to the practice of medicine?

**A:** No.

(Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 42)

In October 2010, Hansen terminated his malpractice insurance coverage. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 25) On April 8, 2011, Hansen surrendered his Texas medical license. At that time he was under a medical board investigation. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 28) In addition, since January 1, 2010, twenty medical malpractice lawsuits was filed against Hansen. (Tab F, Jnt. Ex. 1, Jnt Stipulation of Facts # 31)

Prior to the bike accident, Hansen purchased disability policies covering both the loss of his personal income and his business overhead expenses in the event of a disability. (Tab F, Jnt. Ex. 1, Jnt Stipulation of Facts #s 2 and 7) These policies were issued by Northwestern Mutual Life Insurance Company ("Northwestern Mutual"), the defendant in the Underlying Suit. (Tab B, Page 1) After his biking injury, Hansen submitted claims for benefits under both the disability and the overhead expense policies. (Tab F, Jnt. Ex. 1, Jnt Stipulation of Facts #s 9 and 10) Northwestern Mutual began paying the disability income benefits, and that policy was not in issue in the Underlying Suit,

nor is it at issue in the present case. (Tab F, Jnt. Ex. 1, Jnt Stipulation of Facts # 9)

The Underlying Suit dealt with Northwestern Mutual's actions under the two Disability Overhead Expense ("DOE") policies that Hansen purchased. (Tab B). The DOE policies provided a combined benefit of up to $25,000.00 per month with aggregate benefits of $600,000.00. (Tab F, Jnt. Ex. 1, Jnt Stipulation of Facts #s 6 and 13; Tab F, Pl. Exhibit #s 1 and 2) The parties stipulated that if benefits were not terminated under the policy, Hansen's covered overhead expenses would exceed the maximum benefit of $25,000.00 per month for each month benefits were payable. (Tab F, Jnt Ex 1, Jnt Stipulation of Facts # 13)

After completing its investigation, Northwestern Mutual denied Hansen's claim for DOE benefits. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 12) Northwestern Mutual gave the following explanation for why the benefits could not be paid:

> As previously communicated to Dr. Hansen, we are still unable to provide benefits under these polices because it is our determination that the operation of the business has ended. The contracts define business as follows at section 1.6: "*Except as provided in sections 8.3 and 8.9, the word "business" means the Insured's business or the Insured's*

*professional practice at the time disability starts.*"  Also, as you know, at section 2.2 under Benefit Termination or Adjustment the contract goes on to say that "*If the Insured ends the operation of the business while totally or partially disabled, benefits for Covered Overhead Expense and Waiver of Premium will end.*"

The business or professional practice that Dr. Hansen was engaged in at the time his disability started was that of neurosurgery.  Dr. Hansen admits that <u>he</u> was the practice. Because he was a solo practitioner and he cannot perform the duties of his practice, there is no practice. Without a practice, the operation of the business (as that term is defined by the policy) has ended.

(Tab F, Pl. Ex 1, No. 8)

Northwestern Mutual offered to pay Hansen $75,000, representing three months of coverage associated with a reasonable time for Hansen to wind down his business.  (Tab F, Jnt Ex 1, Jnt Stipulation of Facts # 14) Hansen rejected that offer and retained Roach to file suit.  (Id.)  Prior to trial, the parties stipulated to the facts. (Tab F, Jnt. Ex. 1, Jnt Stipulation of Facts #s 1 – 42)  The Underlying Suit was tried to the court without a jury. (Tabs H and I)  No additional testimony was heard at trial. (Tab L)   The court determined the following:

Findings of fact:

- Hansen closed his business on the date he surrendered his medical license, April 8, 2011.

Conclusions of law:

- Northwestern Mutual breached its contract with Plaintiff when it denied his claim;

- Hansen's entitlement to monthly benefits ended on the date he surrendered his medical license pursuant to section 2.2 of the policy which provides in part:

  > **BENEFIT TERMINATION OF ADJUSTMENT.** If the Insured ends the operation of his business while totally or partially disabled, benefits for Covered Overhead Expense and Waiver of Premium will end.

- Hansen is entitled to recover monthly benefits of $201,827.96 (representing 8 months and two days of benefits payable at a rate of $25,000 per month).

- Hansen is entitled to a premium refund of $6,056.01, representing the amount of the premium paid by Hansen to Northwestern Mutual in November 2010.

- Hansen is entitled to recover statutory interest (at 18% pursuant to §542.060 of the Texas Insurance Code) in the amount of $105,203.70, plus reasonable attorney fees.

(Id.)

In essence, the trial judge in the Underlying Suit disagreed with Northwestern Mutual's position that Hansen ended the operation of his business approximately three months after the biking accident on June

2110219v.3

5, 2010. Likewise, the trial judge disagreed with Hansen's position that the operation of his business had not ended and would continue into the indeterminate future. Rather, the court concluded that Hansen ended the operation of his business on April 8, 2011, when he surrendered his medical license. (Id.)

Hansen was dissatisfied with this verdict and requested that Roach appeal the judgment. Based on correspondence received from the Court's Clerk, Roach erroneously believed that the Final Judgment was entered on October 25, 2013. Consequently, Roach missed the deadline file his notice of appeal. The Third District Court of Appeals dismissed the appeal for want of jurisdiction. In a letter dated March 8, 2014, Roach notified Hansen of his error and the dismissal by the court of appeals. (Tab P) Hansen then sued Roach and the Firm.

(Tab O) In response to Request for Admissions filed in the present lawsuit, Roach admitted that his failure to file a timely Notice of Appeal in the Underlying Suit was negligence. (Tap P)

In an appellate malpractice case where the issue of causation hinges on the possible outcome of an appeal, the issue is to be resolved by the trial court as a matter of law. *Millhouse v. Weisenthal,* 775

2110219v.3

S.W.2d 626, 628 (Tex. 1989). Consequently, the trial judge who presided over Hansen's legal malpractice case against Roach found herself standing in the shoes of the Third Court of Appeals who otherwise would have heard the appeal had it been timely filed. *Id.*

The same stipulated evidence before the court in the Underlying Case was also before the trial court in the legal malpractice case, which is the same stipulated evidence before this Court today. On May 27, 2015, the court in the legal malpractice case granted judgment for the Defendants, because it did not find legally sufficient evidence to overturn the court's verdict in the Underlying Case. (Appendix A to Appellant's Brief) In so doing, the court concluded that Roach's negligence did not proximately cause injury to Hansen.

That court reached the following conclusions of law[1]:

2. Plaintiff's entitlement to monthly benefits ended on April 8, 2011, the date he closed his business.

3. Collection of accounts receivable did not constitute the "continuing operation of the Insured's business" within the plain meaning of the applicable provisions of the insurance policy between Northwestern Mutual Life Insurance Company and Plaintiff.

---

[1] The trial court in the legal malpractice case made a finding of fact that the judge in the Underlying Suit did not abuse her discretion in finding Plaintiff closed his business on April 11, 2011, when he surrendered his medical license. Appellant noted in his Brief that a review as to whether a judge abused her discretion is a conclusion of law. However, the determination that Hansen's practice ended when he surrendered his medical license on April 8, 2011 is a finding of fact.

4.   A timely filed appeal would not have changed the outcome in the Underlying Case. Accordingly, Defendants' failure to timey (sic) appeal did not proximately cause loss or harm to Plaintiff.

## SUMMARY OF ARGUMENT

Hansen's DOE policy provided for payment of expenses incurred "in the continuing operation of the insured's business." The DOE policy included a Benefit Termination provision stating payments would end if Hansen "ends the operation of his business" while totally or partially disabled. The issues before the court in the Underlying Suit were (1) What is meant by the phrase "operation of his business" as that phrase is used in the policy?; and (2) When did Hansen end the operation of his business?" The court in the Underlying Suit found that Hanosen's business was seeing patients and performing surgery on them. The continuing operation of Hansen's business did not include the collection of accounts receivable and the payment of debts. Therefore, Hansen's business ended when he voluntarily surrendered his medical license.

The court in the legal malpractice trial heard the same evidence and reached the same conclusions on all questions of law and fact.

10

Hansen wants this Court to ignore the definitive end of his practice on April 8, 2011, and focus on the continued existence of his P.A. He argues that his business has not ended so long as there are accounts receivable to collect and debts to pay. That logic ignores the distinction between Hansen's practice of neurosurgery and Hansen's collection of fees and payment of debts. The Benefit Termination provision in Hansen's DOE policy states the specific circumstances when benefits will end. Applying Hansen's flawed logic would negate the Benefit Termination provision of the policy. Physicians who permanently ended their medical practice due to disability could avoid the Business Termination provision simply by dragging out their financial affairs until every last penny available under the policy was collected.

Hansen similarly argues that he is entitled under the Texas Business Organizations Code to a winding up period to dissolve his P.A.. Since his P.A. was formed under the Texas Business Organizations Code, Hansen argues that he is entitled a reasonable amount of time to settle the affairs of the P.A.; i.e., collect accounts receivable and pay existing debts.

2110219v.3

The fact that Hansen created a P.A. to protect himself from personal liability has no bearing on when his business ended under the terms of the policy. Determining that coverage persists based on whether a practice was incorporated would result in an inconsistent application of the policy. It would entitle Hansen to ongoing DOE payments even after he ended his practice due to disability, so long as he was still winding up the corporation. But Hansen would not receive those same DOE payments if he was unincorporated and stopped practicing due to disability.

There is no mention in the DOE policies about affording Hansen a winding up period to dissolve his professional association. Indeed, there is no mention that the dissolution of Hansen's P.A. is a prerequisite to ending the operation of his business. Rather, the policy says in plain terms that the DOE benefits end when "the insured ends the operation of his business while totally or partially disabled."

Austin Neurolosurgical & Spine Institute, P.A. may have been the name Hansen practiced under, but his business was seeing patients and operating on them. When Hansen voluntarily surrendered his medical

2110219v.3

license, he gave up his ability to see patients and operate on them. In so doing, he ended his business.

Finally, Hansen argues he is entitled to every penny of the DOE policy benefits because Northwestern Mutual breached the contract. Hansen contends that this breach means that the Benefit Termination provision of the policy no longer applies. Appellees agree that when one party to a contract commits a material breach of the contract, the other party is excused from a subsequent breach. But that has nothing to do Hansen's decision to surrender his medical license. Hansen's voluntary surrender of his medical license was not a breach of the insurance contract. Indeed, there was no evidence at trial in the Underlying Case that Hansen's voluntary surrender of his medical license was in any way related to Northwestern Mutual's breach of contract.

The trial court in the legal malpractice action correctly ruled that a timely appeal would not have changed the outcome in the Underlying Case. Therefore, Roach's failure to timely appeal did not proximately cause Hansen any harm. This ruling was based on the plain language of the contract, and the application of that language to the stipulated

2110219v.3

facts. Hansen's practice ended when he surrendered his medical license on April 8, 2011. He was not entitled to benefits after that date.

## ARGUMENT & AUTHORITIES

### A. Standard of Review: Two Standards Apply

#### 1. Legal sufficiency standard of review applies to evidentiary rulings

In determining whether Roach's negligence proximately caused injury to Hansen, the trial court in the legal malpractice case stepped into the shoes of this Court. *Grider v. Mike O'Brien, P.C.,* 260 S.W.3d 49 (Tex. App. – Houston [1st Dist.] 208, pet. den.). It was charged with determining whether Hansen would have been successful in the appeal of the Underlying Case had this Court presided over a perfected appeal. *Id.* This Court must now determine whether the trial court in the legal malpractice case ruled correctly when it found that Roach's negligence did not proximately cause injury to Hansen.

The legal sufficiency standard applies when a court assesses the sufficiency of the evidence supporting the trial court's ruling. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex. 2001). When a party

attacks the legal sufficiency of an adverse finding on an issue in which he has the burden of proof, he must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Id.* In conducting its review, this Court "must first examine the record for evidence that supports the [trial court's adverse] finding, while ignoring all evidence to the contrary." *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). If there is no evidence to support the trial court's finding, the reviewing court then must examine the entire record to determine if the contrary position is established as a matter of law. *Id.*

The court in the Underlying Case made one finding of fact: Hansen "closed his business on the date he surrendered his medical license, April 8, 2011." (Tab L) Since Hansen challenges this finding of fact, this Court must determine whether there is any evidence to support it. This Court can reject the trial court's finding if there is (1) a complete absence of evidence of a vital fact (2) the court is barred from reviewing evidence offered to establish a vital fact; or (3) no more than a scintilla of evidence was offered to prove a vital fact; or (4) the evidence conclusively establishes the opposite of that fact. *Id.* at 811.

2110219v.3

### 2. De Novo standard of review applies when interpreting the contract

Once this Court determines the legal sufficiency of the findings of facts reached by the trial court, it then must consider those facts in light of the language found in Hansen's DOE insurance policy. Whether a contract is ambiguous is a question of law. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). *De novo* review is applied to address issues that are purely a question of law. *See, e.g., El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 312 (Tex. 1999). Under a *de novo* standard of review, the reviewing court "exercises its own judgment and re-determines each issue of fact and law," affording the lower court's decision absolutely no deference. *Quick v. City of Austin,* 7 S.W.3d 109, 116 (Tex. 1998). The appellate court simply substitutes its judgment for the judgment of the trial court.

This Court must uphold conclusions of law on appeal if the judgment can be sustained on any legal theory the evidence supports. *Waggoner v. Morrow,* 932 S.W.2d 627, 631 (Tex. App. -- Houston [14th Dist.] 1996, no writ). Incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. Id.

16

B.   **The Trial Court Correctly Held that Hansen's Business Ended on April 8, 2011 When he Voluntarily Surrendered his Medical License**

   1.   **The facts indicate the practice ended when Hansen surrendered his medical license**

Hansen's ability to practice medicine ended when he suffered neurological injuries in a biking accident on June 5, 2010. After that date, he never returned to his solo practice. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 16) He never performed another surgery. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 18). He never treated another patient. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 17). Indeed, Hansen testified that he "kind of officially" closed his practice in July, 2011. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 40). At this point, one could argue that Hansen's business had ended. Yet he still had his medical license and was undergoing physical therapy presumably in an effort to regain the ability to return to work. It wasn't until Hansen took the affirmative act of voluntarily surrendering his medical license that his business unequivocally came to an end pursuant to the terms of the policies.

2110219v.3

On April 8, 2011, the operation of Hansen's business ended when the Texas Medical Board formally accepted the Agreed Order wherein Hanson represented under oath that he had closed his medical practice and was voluntarily surrendering his medical license. Monthly expenses incurred after a business has closed are not normal and customary in the *continuing operation* of the insured's business, because the business is not continuing to operate. The policy provides unambiguous language as to when the payments under the DOE policy end: payments end when the insured "ends his business while totally or partially disabled." Once Hansen voluntarily surrendered his medical license the continuing operation of his business ceased.

> 2. **Hansen did nothing after the injury to continue his practice, and he took positive steps to end his practice**

Hansen could have taken measures to continue the business. For instance, he could have hired a *locum tenens* physician to provide neurosurgical services. This point was raised in the following excerpt from the deposition of Sharon Ann Hyde, corporate representative for Northwestern Mutual:

2110219v.3

**Q:** How does a solo practitioner, who is insured under this Northwestern DOE policy who becomes totally disabled, not have – be deemed to have ended his practice?

**A:** We have had claims where people have brought in, for instance, a locum tenens.

**Q:** I'm sorry. A what?

**A:** A locum tenens.

**Q:** What is that?

**A:** Like a fill-in doctor, a temporary doctor. They could bring somebody in – maybe not a locum tenens – but they could bring somebody else in to continue keeping the business afloat. You know, it – they could hire somebody to take on any of those patients that were to be referred.

(Tab F, Pl. Ex. 1, Deposition of Sharon Ann Hyde, p. 31)

Hansen took no measures to keep his doors open. Indeed, he took the opposite approach by sending letters to all of his patients advising them that he was closing his practice. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts # 41) The end of his medical practice was solidified when he proactively surrendered his medical license on April 8, 2011 rather than simply let it expire. (Tab F, Pl. Ex 6)

Hansen's medical practice was already closed on the date he surrendered his medical license as evidenced by the following excerpts from the Finding of Facts set forth in the Medical Board Order:

19

2110219v.3

6. . . . Respondent has closed his medical practice.

7. Respondent has indicated to the Board that he agrees to surrender his Texas medical license in lieu of further disciplinary proceedings.

(Tab F, Pl. Ex 6, page 2) Under the terms of the Agreed Order of Voluntary Surrender, Hansen agreed to "immediately cease practice in Texas." (Tab F, Pl. Ex 1, No 6)

The DOE policy only provides coverage for normal and customary expenses incurred in the *continuing operation of the business.* (Tab F, Pl. Ex 1, Nos. 1 and 2, page 6) Since Hansen testified that he *kind of officially* closed his practice in July 2010, that he contacted all of his patients and told them he closed his practice, and that he told the Texas Medical Board in an official proceeding that he had closed his practice in order to secure an Agreed Order dismissing its investigation of him, there was no continuing operation of Hansen's business.

C. The Lower Courts Interpreted Hansen's DOE Policies Correctly

1. The policy language defines when a practice ends and when DOE payments stop

Appellant correctly noted that the following provisions from the DOE policy are relevant :

2110219v.3

**GENERAL TERMS AND DEFINITIONS.** The policy provides a monthly benefit for Covered Overhead Expenses when the Insured is totally or partially disabled. (Tab F, Pl. Ex 1, No. 1, Insurance policy, page 5)

**BUSINESS.** Except as provided sections 8.3 and 8.9, the word "business" means the Insured's business or the Insured's professional practice at the time disability starts. (Tab F, Pl. Ex 1, No. 1, Insurance policy, page 5)

**COVERED OVERHEAD EXPENSE.** Covered Overhead Expense is the total of monthly expenses that are normal and customary <u>in the continuing operation of the insured's business.</u>" (Emphasis added) (Tab F, Pl. Ex 1, No. 1, Insurance policy, page 6)

**BENEFIT TERMINATION.** If the Insured <u>ends the operation of his business</u> while totally or partially disabled, the benefits for Covered Overhead Expense and Waiver of Premium will end. (Emphasis added) (Tab F, Pl. Ex 1, No. 1, Insurance policy, page 8)

Hansen omitted another important provision found in the Definitions Section of the Disability Overhead Expense Supplement. This provision provides the following:

**BENEFIT TERMINATION.** Your Disability Overhead Expense policy is designed to help cover overhead expense for the owner during your covered partial or total disability. Therefore, <u>if you end the operation of your business or professional practice</u> while disabled, benefits for Covered Overhead Expense and Waiver of Premium will terminate. (Emphasis added) (Id.)

2110219v.3

Hansen's DOE policy only provides coverage for "expenses that are normal and customary in the *continuing operation* of the insured's business." The DOE policy makes it clear that the policy benefits terminate when "the Insured ends the operation of the business while totally or partially disabled." The DOE Supplement gives greater specificity to the terms by stating that benefits end if the insured ends the operation of his business *or professional practice*. Benefits under the policy do not end when the insured stops collecting accounts receivable and paying debts. Likewise, benefits do not end when the insured winds up his professional association. Benefits end when the insured ends his professional practice.

### 2. The position of Texas courts on insurance policy exclusion provisions that are found to be ambiguous

The court is obligated to construe an insurance contract so as to ascertain the true intent of the parties as expressed in the instrument. *Kelly-Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex. 1998). A contract is deemed ambiguous only if it is subject to two or more reasonable interpretations. *Id.* If the language of the contract leads to a definite or certain legal meaning, then it is not ambiguous.

2110219v.3

*Id.* If the language of the contract is subject to two or more reasonable interpretations, then it is ambiguous. *Id.* Where an insurance contract drafted by the insurer is ambiguous, then it should be construed strictly against the insurer and in favor of the insured. *Barnett v. Aetna Life Insurance Co.,* 723 S.W.2d 663, 666 (Tex. 1987). Where the language at issue in the policy involves an exclusion of liability under the policy, then the insured's construction of the exclusionary clause must be adopted so long as that construction is not itself unreasonable. *Id.*

### 3. The Benefit Termination provision of Hansen's DOE policy is not ambiguous

Hansen argues that the Benefit Termination provision of the DOE policy contains an ambiguity that mandates it be interpreted in his favor. This provision provides that DOE benefits end if the Insured ends the "operation of his business" while totally or partially disabled. Hansen recognizes that "operation of his business" could mean practicing neurosurgery, and that the "operation of his business" ended when he surrendered his medical license. But Hansen argues that an ambiguity exists since "operation of his business" also could mean his P.A.'s ongoing payment of debts and collection of accounts receivable.

2110219v.3

Only a handful of cases across the country have dealt with the subject in this lawsuit. None of these cases considered whether the pertinent policy language was ambiguous. None of those cases held that the operation of a medical practice means collecting accounts receivable and paying debts after the physician practice has ended.

The most noted opinion on the subject is *Wilson v. Monarch Life Ins. Co.,* 971 F.2d 312 (9th Cir. 1992). In that case Wilson, an Oregon chiropractor, sought to collect benefits under his DOE policy after he was deemed totally disabled by his physician. Meanwhile, Wilson's license was revoked and he sold his chiropractic practice. The insurance company discontinued the DOE benefits. Wilson sued the insurance company and argued that he continued running his business because he continued to collect accounts receivable, and he continued to incur overhead expenses related to those collections. The 9th Circuit Court of Appeals rejected that argument in the following passage:

> The mere collection of accounts receivable does not constitute running a chiropractic office or business in the plain meaning of those words. This case is analogous to *Paul Revere Life Insurance Company v. Klock,* 19 So.2d 493 (Fla.Ct.App. 1964). In *Klock,* the court held that a dentist could not collect overhead expenses "in the conduct and operation of the insured's office," after the dentist sold his practice but during the period he retained his obligations on

an office lease. *Id.* at 495. Here, we have not merely the sale of a practice, but a state order forbidding Wilson from practicing as a chiropractor. Under these circumstances, he no longer was running his office or business.

*Id.* at 313.

Hansen argues that *Wilson* can be distinguished from this case because the chiropractor seeking ongoing DOE payments had sold the corporate entity under which his practice operated. But that was only one of several factors that guided the *Wilson* court's reasoning. While the court noted that Wilson's sale of his business to another was a factor in its decision, it also reasoned that Wilson could not be running his business when he was forbidden by state order from practicing. *Id.* The trial court in the Underlying Case took the identical position when it held that Hansen's business ended when he surrendered his medical license on April 8, 2011.

A Texas case following *Wilson* is *Principal Mutual Life Insurance Co. v. Toranto,* 1997 WL 279751 (N.D. Tex. 05/15/1997), an unpublished opinion out of the Northern District of Texas. In that case, Dr. Toranto, a plastic surgeon practicing in Dallas, purchased several DOE polices. These DOE policies stated that they would cover "the usual and customary monthly business expenses [Dr. Toranto was] responsible for

in the operation of [his] business." *Id.* at *5. After he became disabled, Dr. Toranto made a claim under the DOE policies. Meanwhile, Toranto entered into a Practice Management Agreement with another surgeon whereby the second surgeon completely took over Toranto's practice. *Id.* at *5. Nevertheless, Toranto provided evidence that he continued to incur business overhead expenses associated with his practice in excess of $24,000 per month even after this Practice Management Agreement was signed. *Id.* at *6.

The insurance company moved for summary judgment, arguing that it had no obligation to continue paying on the policy since Dr. Toranto had stopped practicing and had sold his practice. The court noted that the policy was "specifically designed to pay benefits for overhead expenses incurred *while the insured continued to operate his trade or business.*" *Id.* at *5 (emphasis in original). In finding that the insurance company's obligation to pay under the DOE policy had ended, the court held the following:

> . . . any expenses Toranto may have incurred after February 13, 1996, are irrelevant if he was no longer operating his practice, and there is no indication anywhere in the records that he continued to operate his practice after February 13, 1996. *Id.* at *6.

2110219v.3

It made no difference whether Toranto sold his practice or closed it. Once the practice ended, the right to recover under the DOE policy ended as well. Hansen's ongoing debt collection and debt payment is no more relevant in this case than it was in *Toranto*.

It is important to note that the definition of "covered overhead expenses" found in Dr. Toranto's policy is very similar to the definition of that same phrase in Hansen's policy:

Toranto Policy

Covered Overhead Expenses – "[Toranto's] share of the usual and customary monthly business expenses [he is] responsible for in the operation of [his] business.

*Id.*

Hansen Policy

Covered Overhead Expense – "the total of monthly expenses that are normal and customary in the continuing operation of the insured's business . . . "

(Tab F, Jnt. Ex. 1, DOE Policy, Section 1.7, page 6) The court never entertained the argument that the language in the Toranto Policy was ambiguous.

The court found that once Dr. Toranto ceased the operation of his business, the insurance company's obligation to make disability

payments ceased. *Toranto,* 1997 WL 279751 at *5. The same logic applies to Hansen. Once Hansen surrendered his medical license, the operation of his business ceased, and Northwestern Mutual's obligation to continue disability benefits ceased. The fact that overhead expenses continued had no bearing on the courts' determination in the *Wilson* decision or in the *Toranto* decision, so it should have no bearing in Hansen's case.

### 4. Hansen's interpretation of the Benefit Termination provision is unreasonable

Even if the Benefit Termination Provision is found to be ambiguous, the court cannot accept the insured's construction of the provision if that construction is unreasonable. *Barnett,* 723 S.W.2d at 666. Hansen wants this Court to ignore the definitive end of his practice on April 8, 2011, and focus on the continued existence of his P.A. He argues that his "business" is Austin Neurosurgical & Spine Institute, P.A. While that may be the name of his P.A., that is not his business as that term is used in the policy. Interpreting whether coverage exists based on how Hansen titled his business will lead to an inconsistent application of the policy.

2110219v.3

Hansen was a neurosurgeon in solo practice, plain and simple. His business was a surgical practice where he saw patients and operated on them. Filing articles of incorporation with the Secretary of State didn't change the nature of his business. That business ended from a practical standpoint when Hansen suffered his injury on June 5, 2010, and it ended from a legal standpoint when he surrendered his medical license on April 8, 2011.

But under Hansen's theory, his business continues and he is entitled to receive benefits under the DOE policies so long as his P.A. exists. What if Hansen had registered his practice under an assumed name or d/b/a rather than a P.A.? Under Hansen's theory, his business would continue to exist and he could keep getting money under the DOE policy so long as he continued to pay the nominal annual fee to the county where the assumed name is registered.

What if Hansen merely practiced under his own name rather than as a P.A. or under an assumed name? Using Hansen's reasoning, this Court would have to reach a different result because Hansen would have no corporate structure or assumed name standing between him and the end of his practice. Instead, Hansen's DOE benefits would end

once he surrendered his license. The mere fact that Hansen formed a professional association to limit his personal liability should not create an exception to the Benefit Termination provision of his DOE policy.

Hansen further tries to obfuscate the clear language of the DOE policies when he directs this court's attention to dictionary definitions of the terms "close" and "end." Definitions for these common words are unnecessary and represent an attempt to divert this Court's focus from the key issue in this case. This case isn't about whether "close" and "end" mean the different things. This case is about whether Hansen's practice ended on the date he surrendered his medical license versus an unknown date in the future when he eventually decides to dissolve his P.A. Hansen wants this Court to rule that his practice ends when he winds up his P.A. But the unambiguous language in his DOE policy states that the practice ends when he ends the operation of his business or professional practice. Hansen's business was treating patients. His business ended when he permanently ended his ability to see patients by surrendering his license on April 8, 2011.

Hansen interprets "operation of his business" to include collecting accounts receivable and paying bills even if they continue years after

2110219v.3

Hansen closed his practice and surrendered his license. This interpretation of the phrase is unreasonable. It would force the court to recognize the business as ongoing so long as there are unpaid invoices or debt obligations related to the practice. Under that reasoning, if Hansen doesn't aggressively pursue one receivable then the business hasn't ended. Likewise, if Hansen decides to extend the terms of the loan that he personally made to his P.A., then the business continues. In short, Hanson could make the business last in perpetuity.

It is evident that Hansen kept his P.A. alive largely for the purpose of repaying a loan he made to himself so that he could claim those payments under his DOE coverage. (Tab F, Pl. Ex 9) This activity, long after Hansen has left the practice of medicine, does not reflect normal and customary expenses incurred in the *continuing operation of the Insured's business* as envisioned in Section 1.7 of the policy.

### D.   The Business Organization Code is Irrelevant

#### 1.   The policy does not recognize a "winding up" period as a prerequisite to the business ending

Hansen contends his business continues until he completes the winding up of his P.A.   He cites Section 11.052 of Business

2110219v.3

Organizations Code to support his position that his business is not terminated until the winding up process is completed. He contends that the business continues to the extent necessary to wind up its affairs. According to Hansen, that winding up is comprised of paying liabilities and collecting accounts receivable. But Hansen has failed to show that the Business Organization Code has any bearing on the interpretation of his DOE policies.

The Underlying Suit was a contract case. The issue was whether Hansen was entitled to payments under his DOE policies for the continuing operation of his business after he became permanently disabled, stopped practicing medicine, closed his doors and surrendered his medical license. Hansen was a neurosurgeon. His business was seeing patients and operating on them. Once he surrendered his license and permanently ended his practice due to disability, his business of seeing patients and operating on them came to an end. There is no mention in the DOE policies about affording Hansen a winding up period to dissolve his professional association. Indeed, there is no mention that the dissolution of Hansen's P.A. is a prerequisite to ending the operation of his business. Rather, the policy says in plain terms

2110219v.3

that the DOE benefits end when "the insured ends the operation of his business while totally or partially disabled."

If Hansen had no professional association and merely practiced medicine as an individual, there is no question that the DOE benefits would end once Hansen, due to disability, stopped seeing patients, closed his doors and surrendered his medical license. This would be true whether or not Hansen had ongoing debts to pay and accounts receivable to collect. Consequently, it should make no difference that Hansen practiced medicine through a P.A. His practice still ended on April 8, 2011 when he surrendered his license and thereby ended his ability to practice medicine. The trial court in the underlying case and the trial court in the malpractice lawsuit ruled correctly. No harm came from failing to perfect Hansen's appeal.

### 2. Hansen cites no case law that says the Business Organizations Code applies

The Business Organizations Code provides the parameters for creating and dissolving business entities. Hansen's P.A. is a fictional entity created, in part, to insulate Hansen from personal liability for the acts or omissions of his business. Hansen cites no statute or case law

33

supporting his position that the terms of the DOE policies should take into account the Business Organization Code when determining when Hansen ended the operation of his business. Therefore, the court cannot look to the Business Organizations Code for guidance. The court can look only to the language of the policy and cases interpreting similar policies under similar facts. As noted above, the policy language and the case law support the verdict of the underlying trial court that Hansen's practice ended on April 8, 2011. The trial court committed no error, so the outcome would not have changed had the appeal in the underlying case been perfected.

### 3. Hanson cannot prevail even if the Business Organizations Code applies

Even assuming that the Business Organizations Code has some bearing on how Hansen's DOE policies should be interpreted, the statute still would not change the court's reading of the policy. A professional association such as Hansen's P.A. is defined as an association "formed for the purpose of providing the professional service rendered by a doctor of medicine . . ." TEX BUS. ORG. CODE ANN. §301.003(2)(A). Hansen's P.A. may provide medical/surgical services

34

only through a licensed physician. TEX BUS. ORG. CODE ANN. §301.006. The owner of Hansen's P.A. must be a licensed physician. TEX BUS. ORG. CODE ANN. §301.007(a). Once Hansen ceased being a licensed physician, he was required to "promptly relinquish [his] ownership interest" in his P.A. TEX BUS. ORG. CODE ANN. §301.007(b). Thereafter, Hansen may act as the owner of his P.A. only for the purpose of winding up the affairs of the P.A. TEX BUS. ORG. CODE ANN. §301.007(e). This does not mean the P.A. gets to continue so long as any debts are owed or any accounts receivable exist. Hansen must wind up his P.A. "as soon as reasonably practicable." TEX BUS. ORG. CODE ANN. §11.052(a).

The Findings of Fact and Conclusions of Law in the underlying case are silent on whether a winding up under the Business Organizations Code was contemplated by the verdict. Indeed, there is no mention of the Business Organizations Code anywhere in the court's record in the underlying suit. Presumably this is because the statute is not applicable. Another possibility is that the court took the Business Organizations Code into consideration and determined that ample time for a winding up of Hansen's P.A. had passed by the time Hansen surrendered his license on April 8, 2011. In either event, the Business

2110219v.3

Organizations Code was not determinative in the Underlying Case or in the legal malpractice trial, and it should not be determinative today.

## E. Northwestern Mutual's Breach Does Not Entitle Hansen to All the Benefits Under the Policy

Hansen's last argument is that he is entitled to maximum payment of the DOE policy benefits because Northwestern Mutual breached the contract. He contends that this breach means the Benefit Termination provision of the policy no longer applies. Hansen cites *Mead v. Johnson Group, Inc.,* 615 S.W.2d 685 (Tex. 1981), to further his position that the date he voluntary surrendered his medical license should not be construed as the date his business ended.

*Mead* stands for the position that when one party to a contract commits a material breach of the contract, the other party is excused from a subsequent breach. *Id.* at 689. The problem with this argument is that Hansen's voluntary surrender of his medical license was not a breach of the insurance agreement. It was simply an event that triggered the Benefit Termination provision of the policy.

If Northwestern Mutual's breach of contract caused Hansen to end his business earlier than he otherwise would have, then Hansen might

2110219v.3

be able to argue that he is entitled to DOE payments for that period of time the practice would have existed but for the breach. This argument was not made the Underlying Suit. Moreover, there was no evidence in the Underlying Suit that Northwestern Mutual's breach caused Hansen to voluntarily surrender his Medical License any sooner than he otherwise would have. Perhaps that is why Hansen merely implies that he surrendered his medical license as a consequence of Northwestern Mutual's breach and offers no evidence to substantiate the claim.

In contrast, there is evidence that the primary financial obligation of Hansen's P.A. was the $758,313.51 loan that Hansen personally made to his P.A. just three weeks prior to his career ending bicycle injury. (Tab F, Pl. Ex 1, No. 9) In addition, there is evidence that Hansen had more than 20 pending medical malpractice lawsuits filed against him. (Tab F, Jnt. Ex. 1, Joint Stipulation of Facts, #31) Finally, there is evidence that Hansen agreed to surrender his license "in lieu of further disciplinary proceedings." (Tab F, Pl. Ex 1, No. 8). The trial court had many reasons to conclude that Hansen decision to surrender his medical license had nothing to do with Northwestern Mutual's breach.

2110219v.3

A court of appeals can reverse a trial court's verdict if there is *no evidence* to support the trial court's finding. The facts provide the requisite evidence to support the trial court's finding in the Underlying Suit that Hansen ended his practice on April 8, 2011.

## CONCLUSION

Based on the plain and unambiguous reading of the DOE policy, the trial court in the Underlying Case correctly ruled that Hansen's business – treating neurosurgical patients – ended when he stopped seeing patients, closed his doors to the public, discontinued his malpractice insurance and voluntarily surrendered his medical license. The fact that Hansen continued to pursue accounts receivable and pay debts had no bearing on the date that his practice ended. Likewise, the fact that Hansen formed a professional association did not create an exception to the Benefit Termination provision in his DOE policies.

The policy does not provide that the dissolution of Hansen's P.A. is a prerequisite to ending the operation of his business. If this Court determined that the Business Organizations Code entitled a physician to DOE payments pending the dissolution of his P.A., then DOE policies would apply differently depending on whether a physician was or was

38

not incorporated. A physician with an incorporated practice would continue to get DOE payments, but an unincorporated physician would not since the Business Organizations Code would not apply.

Finally, Hansen's argument that Northwestern Mutual's breach of the contract negates the Benefit Termination provision of the contract is unsupported by the law and it is unsupported by the facts. Moreover, there is no evidence that Hansen would have ended his practice at a later date had Northwestern Mutual's breach not occurred.

Had Roach properly perfected the appeal this Court would have affirmed the trial court's judgment and Hansen's outcome would not have changed. Therefore, Roach's failure to perfect the appeal did not proximately cause any harm to Hansen.

## PRAYER

Wherefore, Appellees pray that the court affirm the judgment of the trial court and render judgment on behalf of Appellees as to all causes of action.

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER
909 Fannin Street, Suite 3300
Houston, TX 77010
(713-785-7780 (fax)

2110219v.3

/s/John R. Shepperd
John R. Shepperd
State Bar No. 18236050
713-353-2010
John.Shepperd@wilsonelser.com

## Certificate of Compliance with TRAP 9.4(i)(3)

This brief contains a total of 7641 words excluding the parts exempted under TRAP 9.4(i)(1), as verified by Microsoft Word. This brief is therefore in compliance with TRAP 9.4(i)(2)(B).

/s/John R. Shepperd

## Certificate of Service

A copy of this brief has been served on all counsel of record in accordance with the Texas Rules of Appellate Procedure this 19th day of November, 2015.

Scott R. Kidd
Scott V. Kidd
Kid Law Firm
819 West 11th Street
Austin, Texas 78701
512-330-1713 - Telephone
512-330-1709 - Facsimile
scott@kiddlawaustin.com
svk@kiddlawaustin.com

/s/John R. Shepperd

40

2110219v.3